WILL OF RIEMER: GERBER, Appellant, vs. RIEMER and others, Respondents.

*October 7—November 5, 1957.*

18

For the appellant there was a brief and oral argument by *Harvey R. Habeck* of Milwaukee.

For the respondent B. Burdette Burling, administrator, there was a brief and oral argument by *Carl H. Juergens* of Milwaukee.

For the respondent Irene Potthast there was a brief by *Kaumheimer, Alt & Likert,* and oral argument by *Roger L. Boerner,* all of Milwaukee.

CURRIE, J.   The appellant proponent urges on this appeal that the evidence does not sustain the trial court's finding that the purported will and codicil were executed as a result of insane delusions on the part of Mrs. Riemer toward her husband.

The delusions, which had existed for at least five years prior to the making of the will, were that Mr. Riemer was intent upon doing away with her by poisoning her food, or attacking her when she was asleep with a knife, hammer, hatchet, or some other household tool.  The appellant does not seriously dispute the abundantly proved fact that she harbored such delusions but contends: (1) That there were some existing facts which afforded a groundwork for the delusions thereby rendering the same not insane delusions as a matter of law; and (2) that such delusions had no ma-

terial effect upon the testamentary disposition which she attempted to make in her will.

This court has held that in order for a delusion to void a will it must be an *"insane delusion." Will of Jacobson* (1937), 223 Wis. 508, 511, 270 N. W. 923. There are many varying definitions of insane delusion to be found in the reported cases. Some of such definitions are set forth in the annotation entitled: "Insane delusion as invalidating a will," 175 A. L. R. 882, 887–889. One of the better of the definitions which we have considered is that stated by the Washington court in *Estate of Klein* (1947), 28 Wash. (2d) 456, 472, 183 Pac. (2d) 518, 526, as follows:

". . . an insane delusion denotes a false belief, which would be incredible in the same circumstance to the victim thereof were he of sound mind, and from which he cannot be dissuaded by any evidence or argument."

We do not interpret this definition as requiring that in all cases proof must be established of an unsuccessful effort to dissuade, but merely that the belief must be shown to be of a character that it will be adhered to against all evidence and argument showing its falsity. Anno. 175 A. L. R., p. 902, sec. 18.

California has adopted a definition of insane delusion which excludes from such classification any delusion based on an evidentiary fact, "however slight." *Estate of Horton* (1932), 128 Cal. App. 249, 17 Pac. (2d) 184. Similarly, Illinois has held that in order for a delusion to be an insane one there must have been "no evidence" on which to base the mistaken belief. *Snell v. Weldon* (1910), 243 Ill. 496, 90 N. E. 1061. These restrictive definitions have been justly criticized by the author of a commentary entitled, "Wills— Insane Delusions Respecting Members of the Family and Heirs at Law," 31 Marquette Law Review, 238, 242, as follows:

"It has been said in some of the cases and texts that an insane delusion such as will affect testamentary capacity is an idea or belief which has no basis in fact or reason and evidence, or in other words a belief in a state of facts that does not exist and which no rational person would believe to exist. This would seem to indicate that where there is any evidence to support the testator's belief, it is not an insane delusion. However, an examination of the cases shows that the courts have found an insane delusion even though there was some slight evidence on which the testator might have formed his belief. Beliefs originally based on some evidence and magnified beyond all reasonable proportion have been considered insane delusions, to the same extent as if they had not been based upon any evidence."

The previously referred to annotation in 175 A. L. R., at pages 914–919, sets forth numerous cases in which courts have held an insane delusion to have existed even though there were slight facts in evidence which might have helped produce the delusion. This court so held in *Ballantine v. Proudfoot* (1885), 62 Wis. 216, 22 N. W. 392. In that case a judgment of the circuit court denying a will to probate was affirmed which had been entered on an appeal from the county court. The evidence disclosed that Mrs. Stewart, the testatrix, had the delusion that her only daughter and the latter's husband, the Proudfoots, proposed to poison testatrix, or make away with her in some way. The same argument was advanced by the proponent as has been advanced in the instant appeal, viz., that there was a basis in fact for such delusion. This was because there was evidence that the Proudfoots had "assailed" Mrs. Stewart, and had said things "affecting her character for chastity." The Proudfoots denied having done so. The court disposed of this phase of the case by the following comment (62 Wis. at p. 222):

"We will not dwell upon this point or stop to inquire what the real truth was. This does not seem to have been the

real cause of Mrs. Stewart's aversion to the Proudfoots; but she really believed they wanted to get her out of the way, and were trying to poison her. This is the secret of her unnatural feelings toward them,' and shows that she was mentally unsound, or was laboring under an insane delusion when she made her will."

We conclude that, in reviewing the evidence, the question before us is not whether there is any evidence on which Mrs. Riemer could base her delusions, but rather whether there is any evidence from which a *sane* person could draw the conclusion which formed such delusions. 1 Page, Wills (lifetime ed.), p. 295, sec. 144. The Arkansas court in *Taylor v. McClintock* (1908), 87 Ark. 243, 279, 112 S. W. 405, 414, uniquely stated such principle as follows:

"Evidence is the means by which facts are proved. All evidence must be addressed to the sane mind. That which no sane mind would believe at all does not rise to the dignity of evidence. And a belief in something that no sane man could believe is evidence of insanity. 1 Wharton & Stille, sec. 83."

Having brought the governing principles of law into sharp focus, we will now proceed to analyze the evidence in the light thereof.

. Mrs. Riemer was a lady of some education and culture. After being graduated from high school she had attended the Milwaukee Normal School, and had taught school for two years before marrying Mr. Riemer in 1899 at the age of twenty-two. No children were ever born as the issue of such marriage. Mr. Riemer was seven years older than she and for many years he was engaged in the wholesale shoe business in Milwaukee. This business was conducted as a corporation and Mrs. Riemer had served as secretary of the company. In 1932, Mr. Riemer sold out the business and retired. Mrs. Riemer was interested in painting and music. She took lessons in painting china and playing the harp and

spent considerable time in pursuing both of these hobbies. She attended concerts and meetings of her church guild, and for many years, extending nearly up to the time of her death in 1956, she belonged to a bridge foursome. In later years she handled all money matters of the family, and possessed considerable knowledge with respect to the wise investment of money in stocks and bonds.

In 1947, she suffered from cancer and had a colostomy operation performed. This was the ailment from which she eventually succumbed. Mrs. Schraut, who resided a block and a half from the Riemer home, was employed as a practical nurse for five weeks to take care of Mrs. Riemer after she returned from the hospital in November, 1947. During such five weeks Mrs. Schraut spent much time in the Riemer home. Mrs. Riemer informed Mrs. Schraut that she was afraid Mr. Riemer would poison her or attack her at night with a knife. Mrs. Riemer told Mrs. Schraut to hide the jelly behind the drapes. Mr. Riemer overheard this and laughed and said he ate the jelly, too, and that he did not die of poisoning. As to the jelly, she also told Mrs. Schraut that Mr. Riemer had put Babo, a cleansing compound, into it in order to kill her. This charge was made by Mrs. Riemer to others, but there is not an iota of evidence that Mr. Riemer ever put Babo in the jelly, other than Mrs. Riemer's own statement to such effect. At night Mrs. Riemer barricaded her bedroom door by crisscrossing knives, and also kept a knife secreted in her bed. Mrs. Schraut observed no conduct on the part of Mr. Riemer of an untoward nature toward Mrs. Riemer. Mrs. Schraut and Mrs. Riemer became good friends and after her employment ended, Mrs. Schraut made calls at the Riemer home and the two ladies attended concerts together. This friendly relationship continued until about two years before Mrs. Riemer died. Then one day upon leaving the Riemer house, Mr. Riemer walked outside with Mrs. Schraut until she rounded the corner of

the house during which time they engaged in conversation. Thereafter, Mrs. Riemer turned against Mrs. Schraut and would not see her. This incident of the conversation between Mr. Riemer and Mrs. Schraut will be referred to again.

Several of the close neighbors of the Riemers testified that Mrs. Riemer told them that Mr. Riemer had tried to do away with her by putting poison in the jelly and in the sugar, and that she feared he would kill her with some tool or sharp instrument. One neighbor, Mr. Farner, who is a graduate of Marquette Law School and Carroll College, and a teacher in the Steuben Junior High School in Milwaukee, recalled that the first time Mrs. Riemer told him that Mr. Riemer wanted to do away with her was in July, 1947. In the fall of 1948, when Mr. Farner was helping put storm windows on the Riemer home, Mrs. Riemer told him that she was afraid Mr. Riemer was going to poison her.

Two other neighbors, Pearl Gede and Marion Augustine, testified to statements made to them by Mrs. Riemer about her husband trying to do away with her. They stated that she conversed intelligently on other subjects, but that they considered she was not right mentally when she discussed Mr. Riemer and his attempts to do away with her.

In February, 1953, Mrs. Riemer charged her husband with disorderly conduct in the district court. He retained no lawyer and was convicted upon the testimony of Mrs. Riemer and Irene Stack and placed on probation for six months. The district court had Mr. Riemer examined by Dr. Andrew I. Rosenberger, a well-known specialist in mental diseases. Dr. Rosenberger found that there was no evidence of Mr. Riemer having any delusions or hallucinations, and recommended a psychiatric evaluation of Mrs. Riemer because he suspected that she had paranoid delusions toward her husband.

During the six months' probationary period, Mr. Mueller, a Milwaukee county probation officer, made several calls at

24

the Riemer home. Mrs. Riemer told him that Mr. Riemer was making various attempts on her life extending back many years. She showed Mueller how she had cut a separate opening directly from her bedroom on the first floor into the bathroom and said that at night she kept the doors to both rooms locked. (Mr. Riemer slept in a bedroom on the second floor where there was another bathroom.) In August, 1953, Mrs. Riemer gave Mueller some powder "which she felt was some kind of poison." Mueller took the powder to the city laboratory and had it tested. The report of the test was "Poisonous metals absent." On another occasion Mrs. Riemer took Mueller into her bedroom to point out what she claimed were signs that a knife had been attempted to be slid between the jam and the door. Mueller examined very carefully but could see no signs of this having been done. At that time Mr. Riemer was eighty-two and a half years old and in such precarious physical condition that he was incapable of any act of violence.

Mr. Mueller was a trained probation officer with several years' experience. He had received both a Bachelor's and a Master's degree from the University of Wisconsin and had taken courses in psychiatry and psychology. It was his opinion that Mrs. Riemer was suffering from delusions not based on fact.

One of the strongest pieces of evidence that Mrs. Riemer was suffering from insane delusions is a letter which she wrote on August 10, 1953, and mailed to her niece, Irene Potthast, who resides at Omaha, Nebraska. In such letter she set forth her version of the incident testified to by Mueller as having occurred in August, 1953, and also of the incident related by Mrs. Schraut of walking out of the Riemer home accompanied by Mr. Riemer. We quote from such letter as follows:

"Friday Mr. Mueller, the probation officer, came and I gave him the bottle that I suspected was part poison. Alfred noticed it on the floor and asked what it was. Mr. M. said,

'I am taking it with me to see if there is poison in it.' Then Alfred said, 'Yes, there is poison in it. I placed a chunk of brown stuff in it and pour water over it.' Alfred was furious. Friday morning Mrs. Schraut asked over phone if she could buy anything for me on North ave. I answered, shampoo. When she came back she visited a little. As she left, walked from rear door to corner, then turned south, Alfred walked with her, he was angry. He said, 'I'll get her yet. I have enough poison in the basement for over a year.' "

Both Mrs. Schraut and Mueller were reputable, disinterested witnesses, and if Mr. Riemer had ever made the statements about poison in their presence, as alleged in the letter, it is inconceivable that they would not have recalled them and testified as to the same. We are reasonably satisfied that Mr. Riemer did not make either of such statements, and that they are a figment of Mrs. Riemer's diseased mind.

As hereinbefore stressed, a false belief in order to be an insane delusion must be of such a character that it is likely to be adhered to in the face of all argument or evidence establishing its falsity. We consider Mrs. Riemer's delusion, that Mr. Riemer was attempting to poison the jelly and sugar, to be of this type, without any evidence being introduced of an unsuccessful effort to persuade her that such belief was false. However, the testimony of Mr. Riemer, corroborated by Mrs. Schraut, is that on one occasion, when Mrs. Riemer complained that the jelly had been poisoned, Mr. Riemer ate some of the jelly to demonstrate to her that it had not been poisoned. Nevertheless, she thereafter persisted in her erroneous belief that he was attempting to poison the jelly. It was Dr. Rosenberger's opinion that Mrs. Riemer's delusions continued until her death.

Dr. Rettig was an attending physician to both Mr. and Mrs. Riemer. His deposition was taken in behalf of the objector but much of the doctor's testimony in such deposition was excluded by the trial court as being privileged. There was admitted, however, the doctor's opinion that

Mr. Riemer "was a doddering old man, . . . who was not capable of sufficient physical violence to end anybody's life." Mrs. Riemer, in a letter to Irene Potthast, stated that a doctor had advised her to such effect, which raises the inference that Dr. Rettig was such doctor. Nevertheless, she went on harboring the delusion that Mr. Riemer would attempt to kill her.

We now turn to the evidence upon which the proponent Gerber relies as forming a factual basis for Mrs. Riemer's delusions. There is considerable evidence that around 1953, when Mr. Riemer had become somewhat senile, he nailed rough pieces of metal to the soles of his shoes, put away baking dishes unwashed, burned some chocolate milk he was preparing on the stove, mended his trousers by using as patches portions of a woman's stocking, and on at least one occasion urinated in the kitchen sink. The probable reason for placing the metal pieces on his shoes was that at about that time he had sustained a severe fall on a slippery pavement or sidewalk. The learned trial court did not give much weight to this testimony as affording a rational basis for Mrs. Riemer's delusions that Mr. Riemer was attempting to kill her by poison and other means. Furthermore, the inception of such delusions back in 1947 preceded by some considerable time these acts of senility.

The testimony of other acts of Mr. Riemer relied upon by the appellant was that given by Irene Stack, Elmer Gerber, and Irene Potthast. Elmer Gerber was Mr. Riemer's nephew. Although he was only bequeathed a rose bowl by Mrs. Riemer's purported will he was named as the executor by the codicil. Miss Stack was bequeathed $300, and Miss Potthast was made one of the three residual legatees who were bequeathed the bulk of Mrs. Riemer's estate.

Miss Stack came to the Riemer home once each week during the last fifteen years of Mrs. Riemer's life and did housework. She testified that she found knives hid under

the workbench in the basement and once found one on the stairway leading to the first floor, and also found a hammer on such stairway. She also removed from the cupboard under the kitchen sink an insect powder which Mr. Riemer used for caring for the roses planted outside. She removed it to the basement, and Mr. Riemer again replaced it in the cupboard under the sink. The only act of any violence, or threatened violence on the part of Mr. Riemer, which she testified to, occurred in May, 1953, some three months after the will was executed. On that occasion she testified that Mrs. Riemer ordered Mr. Riemer to take off the shoes he was wearing which had the metal pieces affixed to the soles. According to Miss Stack, Mr. Riemer became angry and took off one of the shoes and threw it, striking Mrs. Riemer, who was but three feet away, in the stomach. Such event, if it did occur, could have afforded no possible basis for Mrs. Riemer entertaining delusions regarding her husband at the time she made the will.

During Miss Stack's testimony she had to be cautioned several times by the trial court about volunteering information not asked of her. Finally, she apologized and said, "I don't understand." To this the trial court replied, "You understand very well, only that you are quite interested in the case. You are more or less partisan. That is my observation."

Elmer Gerber had known the Riemers for approximately fifty years. He testified that he went to the Riemer home every Saturday during the five-year period ending in 1956 to do shopping for the Riemers and other errands. In direct conflict with the testimony of many other witnesses, that Mr. Riemer always treated Mrs. Riemer well, he testified with respect to Mr. Riemer's treatment of Mrs. Riemer as follows: "He was very belligerent to her many times. He threatened her . . . with his arms swinging around." Gerber also testified that Mr. Riemer called Mrs. Riemer a

"damn fool" several times. When asked to fix the date of any of the occurrences so testified to he named the fall of 1952. The credibility of this witness was entirely for the trial court and his testimony could be disregarded if the trial court deemed it incredible. *Estate of Bradbury* (1957), 275 Wis. 564, 567, 82 N. W. (2d) 804. Furthermore, no rational mind would be likely to deduce from such testified conduct of Mr. Riemer swinging his arms in a belligerent manner that he was poisoning the jelly and sugar. In any event, the origin of Mrs. Riemer's delusions antedated such events.

Miss Potthast testified that she visited in the Riemer home at Christmas time in 1951, and that in her presence Mr. Riemer took a knife with a retractor blade out of his pocket. Miss Potthast then asked him why he carried it. According to her, he replied, "I may need it some day." Although Miss Potthast had visited at the Riemer home since 1948 on an average of two or three times per year, she testified to no belligerency or other wrongful attitude of Mr. Riemer toward Mrs. Riemer.

The brief submitted in behalf of Irene Potthast on this appeal relies on statements contained in Mrs. Riemer's letters to the former as establishing facts forming a justification for Mrs. Riemer's delusions. For example, Mrs. Riemer wrote that Mr. Riemer had put Babo in the jelly. While such letters constitute hearsay evidence, no objection was made to their admission on that ground, and they were admitted.

We deem that the answer to the problem of what weight must be accorded such statements is to be found in the opinion of this court in *Will of Shanks* (1920), 172 Wis. 621, 179 N. W. 747. In that case, the trial court found that the deceased testator harbored an insane delusion against his wife, which affected the making of his will. On appeal to this court the proponent relied upon a statement in the

will itself, in which testator explained his attitude toward his wife, as negativing the existence of any insane delusion. This court, in an opinion written by Mr. Justice VINJE, stated (p. 624):

"Were it not for the well-known propensity of insane persons, or those suffering from insane delusions, to negative their true state of mind or to be unaware of it, more importance might be attached to the statement made in the will."

When, as here, there is a strong inference that the testatrix's delusions were grounded upon facts that did not exist, but which she imagined, her self-serving statement that such facts existed, whether they be set forth in the will itself, or in a letter, should be accorded little weight in passing on the issue of whether she suffered from an insane delusion.

It is our considered conclusion that the trial court could well find upon the evidence in this case that no facts existed which would have caused a sane person in Mrs. Riemer's situation to reach the conclusion that Mr. Riemer was trying to do away with her by poison, or other means. Therefore, the trial court's finding that Mrs. Riemer suffered from insane delusions at the time of the making of the will and codicil will not be disturbed on this appeal.

The appellant places great reliance upon *Estate of Bickner* (1951), 259 Wis. 425, 49 N. W. (2d) 404. There the trial court found that the testator widower was obsessed by insane delusions that his nephew, Arthur, and the latter's wife, were stealing and illegally taking away some of his property, and denied the will to probate. The evidence disclosed that the nephew and his wife had removed from testator's home some figurines and rugs, and that testator had watched such removal from the vantage point of the barn. Arthur and his wife testified that such articles had belonged to testator's deceased wife and that she had given them to Arthur and his wife. This court reversed on the ground

that there was a factual basis for testator's delusions. The *Bickner Case* is readily distinguishable from the instant case. In the former there were facts upon which a sane person could reach the same erroneous conclusion that was drawn by the testator, which is not the situation in the instant case.

We will now consider the second contention raised by the appellant, viz., that the delusions of testatrix must be held as a matter of law to have had no material effect upon the testamentary disposition set forth in the will. In passing on such contention it is necessary to set forth further pertinent facts.

When Mr. Riemer sold his business and retired in 1932 he realized the sum of $49,000. He retained $25,000 and turned $24,000 over to Mrs. Riemer. Some of Mr. Riemer's $25,000 was lost through unfortunate investments and the remainder was consumed over the years in living expenses of the parties. Mrs. Riemer invested her $24,000, apparently wisely. The home of the parties had been purchased by Mr. Riemer with his own funds many years before his retirement, and title thereto was held in joint tenancy by Mr. and Mrs. Riemer. In 1943, Mr. Riemer inherited $10,000 from his sister. Mrs. Riemer brought such pressure to bear upon him to turn this amount over to her that he finally yielded and did so in 1944. In order to accomplish this result, Mrs. Riemer threatened to charge Mr. Riemer for room and board unless he did so turn such inherited sum over to her. In 1952, Mrs. Riemer's sister, Minnie Betten, died, and Mrs. Riemer received from her sister's estate a bequest in the approximate sum of $24,000. The petition for probate filed by the appellant Gerber estimated the value of the personal property of Mrs. Riemer at the time of her death to be $30,000, but such value may well exceed such sum. She owned no real estate other than her joint tenancy interest in the homestead, except an interest in some land in Nebraska which she had inherited.

The evidence is all to the effect that Mr. Riemer was a kind and indulging husband up until he became afflicted with senility in his old age. Even during such latter period the preponderance of the evidence is that his conduct toward his wife was kindly. After retirement, Mr. and Mrs. Riemer spent some winters together in Florida and one in California. Mr. Riemer indulged his wife's hobbies of china painting and playing the harp. He spent large sums for lessons in both these arts, for the firing of the many china pieces painted by Mrs. Riemer, and for two harps.

By her will, Mrs. Riemer to all intents and purposes completely disinherited her husband. All that he was bequeathed were some dishes bearing the initial emblems "R" and "K." The will even attempted to bequeath Mr. Riemer's ring to one of Mrs. Riemer's nieces.

Paragraphs *Tenth* and *Thirteenth* of the will are of particular interest. Paragraph *Tenth* provided: "It is my will that all real estate owned jointly by my husband, Alfred R. Riemer, and myself, shall upon my decease, descend to my husband." Paragraph *Sixteenth* read: "I further direct that my executrix hereinafter named shall sell my property located at 2039 North 36 street as soon as convenient after my decease and divide the proceeds thereof, share and share alike to my niece Irene Potthast, my niece Minnie Peterson, and my nephew Lavere Potthast. I hereby give her full power and authority to sell said property and convert same into cash without an order from the court."

Inasmuch as the only real estate owned in joint tenancy by the Riemers was the homestead, such two paragraphs of the will were in sharp conflict with each other. We surmise that paragraph *Tenth* was inserted by the lawyer scrivener without knowledge that the home was owned in joint tenancy, while paragraph *Sixteenth* expressed the actual intent of Mrs. Riemer as to what should be done with the home upon her death.

. The governing principle of law applicable to this phase of the case was stated in *Will of Shanks, supra* (172 Wis. at p. 624), as follows:

"It is not a question whether testator had general testamentary capacity, for many persons laboring under insane delusions may be competent to make a will (*Will of Cole*, 49 Wis. 179, 5 N. W. 346), but whether the insane delusion under which the testator suffered materially affected the will he made. In other words, is it reasonably certain that but for the insane delusion his wife would have received a materially larger devise? If that is reasonably certain, then mental incapacity is sufficiently shown to invalidate the will made. Ann. Cas. 1916C, 4. There is no good reason shown why, under the circumstances of this case, the testator should not have left all his property to his wife, who for fifty years had helped earn it and whose needs required the income of all of it, if not the principal or a part thereof, for her support. By the will she was required to pay taxes and keep up the homestead. This, it is shown, would nearly exhaust the income of the $3,000 given her, leaving her almost nothing for support in her old age. A sane man would not do that to a wife who for over fifty years had faithfully performed all the duties of wifehood—especially so where, as here, his nephews and nieces had little claim upon his bounty."

In the instant case it was her husband and not the two nieces and nephew, who were bequeathed the great bulk of the estate as residuary legatees, who had the first claim to Mrs. Riemer's bounty. This is because of all that Mr. Riemer had done for her during their more than fifty years of married life, and some considerable portion of her estate had been acquired with moneys turned over by him to her. If paragraph *Sixteenth* had been legally effective, as she intended it to be, the effect of the will would have been to have left this aged and decrepit old man entirely penniless. We have no hesitancy in sustaining the trial court's determination that the insane delusions of Mrs. Riemer with respect to her

husband materially affected the disposition of her property attempted to be made by her will.

*By the Court.*—Judgment affirmed.