ESTATE OF O'LOUGHLIN: O'BRIEN and another, Appellants, v. LUMPHREY and another, Respondents.

*No. 198. Argued January 4, 1971.—Decided February 5, 1971.*
(Also reported in 183 N. W. 2d 133.)

144

For the appellant Helen Deering there was a brief by *Doar, Drill & Norman* of New Richmond, and oral argument by *James A. Drill*.

For the respondents there was a brief by *Wilcox & Wilcox* of Eau Claire, and oral argument by *Francis J. Wilcox*.

HALLOWS, C. J. O'Loughlin was born in North Dakota. He never married; through savings and investments he accumulated assets approximating $400,000. He lived in North Dakota and Minnesota until 1962. In November of that year he was admitted to the St. Joseph's Nursing Home in River Falls, Wisconsin, and was found to have Parkinson's disease in a severe stage, which, according to the examining doctor's opinion, was caused by arteriosclerosis. In February of 1964 a general guardian was appointed for him and about a month and a half later he made his first and last will.

### *Testamentary capacity.*

The objector to the will claims O'Loughlin did not have testamentary capacity because he did not understand the

extent and nature of his property. It is argued this incapacity is proved by the difference between the inventory in his guardianship and in his estate and by the complexity of his investments in various stocks and land. It is claimed that because of his advanced case of Parkinson's disease O'Loughlin was physically and mentally incapable of managing his property and dealing with it in making the will, and this incompetency was established by the fact that forty-three days prior to making the will it was necessary to have a guardian appointed for him.

The issue then is whether the trial court's finding of testamentary capacity is contrary to the great weight and clear preponderance of the evidence; we think it is not. The test for testamentary capacity in this state has been virtually unchanged for approximately 100 years since it was settled in *Holden v. Meadows* (1872), 31 Wis. 284, 294. In *Holden* this court examined the prior authorities and adopted four expressions of the rule. Essentially that test has three basic elements which have been variously repeated and restated. *See Will of Wicker* (1961), 15 Wis. 2d 86, 88, 112 N. W. 2d 137.

The testator must have mental capacity to comprehend the nature, the extent, and the state of affairs of his property. The central idea is that the testator must have a general, meaningful understanding of the nature, state, and the scope of his property but does not need to have in his mind a detailed itemization of every asset; nor does he need to know the exact value of his property. A perfect memory is not an element of a testamentary capacity. 1 Page, *Wills* (Bowe-Parker), p. 617, sec. 12.12. The testator must know and understand his relationship to persons who are or who might naturally or reasonably be expected to become the objects of his bounty from which he must be able to make a rational selection of his beneficiaries. He must understand the scope and general effect of the provisions of his will in relation to his legatees and devisees. Finally, the testator must be able to

contemplate these elements together for a sufficient length of time, without prompting, to form a rational judgment in relation to them, the result of which is expressed in the will.

Two doctors who witnessed the execution of the will and questioned O'Loughlin before its execution testified O'Loughlin had sufficient testamentary capacity on April 10, 1964, to execute it. It is true the testator was suffering from Parkinson's disease, but a person may be incompetent to make a will at one period of time and yet be competent during a lucid interval between periods of sickness. *Will of Silverthorn* (1887), 68 Wis. 372, 378, 32 N. W. 287. In a somewhat similar case, this court found a testator suffering from advanced arteriosclerosis competent to make a will on the date of its execution. *Estate of Phillips* (1961), 15 Wis. 2d 226, 112 N. W. 2d 591. The testator needs only to have testamentary capacity at the time of executing the will; it is not necessary he is or remains competent for any great length of time before or after the execution. *Estate of Wegner* (1925), 185 Wis. 407, 414, 201 N. W. 826; *Estate of Fuller* (1957), 275 Wis. 1, 81 N .W. 2d 64.

The appointment of a guardian, while some evidence of incompetency, is not controlling on the issue of testamentary capacity. There are many degrees or kinds of mental illness which may require the appointment of a guardian, but the test to manage one's affairs, which involve many acts over a period of time, is not the same as for the disposition of property by the one act of executing a will. In view of the doctors' testimony on the testator's mental capacity on the day he executed his will, the appointment of a guardian is not controlling. *Estate of Phillips, supra.*

The amount of assets which were found after the testator's death and were not listed in the guardian's account amount to approximately $7,000. From the failure of the guardian to know and to inventory $7,000 out of an

estate of approximately $400,000 gives rise to no compelling inference that the testator had such a poor memory he could not comprehend his estate. Nor need the testator know the accurate value of his property. *Will of Ganchoff* (1961), 12 Wis. 2d 503, 107 N. W. 2d 474. Very few people know the exact value of their assets or exactly the amount of money they have in their checking account at any given time unless they have received a notice of overdrawal.

The size of and the variety of investments comprising the estate are not controlling. What is important is the testator's mental ability to deal with his property, such as it is, rationally in considering its nature, the objects of his bounty, and what he is attempting to do by way of disposition in the will. *See Estate of Gaudynski* (1970), 46 Wis. 2d 393, 396, 175 N. W. 2d 272.

### *Undue influence.*

The trial court found there was no undue influence exercised upon the testator and it is argued this finding is against the great weight and clear preponderance of the evidence. No dispute exists over the ultimate facts which must be proved by clear and satisfactory evidence to constitute undue influence. As we have said before, the test has stood for years. In the *Will of Freitag* (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108, it was summarized and stated in capsule form as follows:

"Susceptibility, opportunity to influence, disposition to influence, and coveted result. Stated more completely: 1. A person who is susceptible of being unduly influenced by the person charged with exercising undue influence; 2. the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor; 3. a disposition on the part of the party charged, to influence unduly such susceptible person for the purpose of procuring an improper favor either for

himself or another; 4. a result caused by, or the effect of such undue influence."

This statement has been repeated many times and as recently as *Estate of Gaudynski, supra,* at page 400.

It is quite true some influence may have been asserted by the attorney, a sister in the nursing home, and the guardian on O'Loughlin to make a will, but the testimony is not against the great weight that such influence was undue. The nursing home had sufficient opportunity to influence and no doubt both the guardian and the attorney had such opportunity, but there is no evidence that either of the churches in North Dakota had any opportunity to influence him. Whether O'Loughlin was susceptible to undue influence rests on conflicting evidence. Part of the medical testimony is to the effect the testator was upset and frustrated by his inability to manage his affairs. Other witnesses testified that O'Loughlin had independence of mind and determination and was not to be unduly influenced. We repeat again what we said in the *Estate of Gaudynski, supra,* at page 400:

"All influence on a person to make certain provisions in a will is not undue. People in everyday life make up their minds because of the influence of others. People only act when motivated. An influence is only undue 'when it becomes so strong it overpowers and compels the exercise of the will of the person subjected to it.' *Will of Cooper* (1965), 28 Wis. 2d 391, 400, 137 N. W. 2d 93. The test is whether the 'free agency of the testator has been destroyed.' *Will of Faulks* (1945), 246 Wis. 319, 17 N. W. 2d 423. And it has been said 'A disposition to unduly influence a testatrix means something more than a mere desire to obtain a share of an estate. It implies a willingness to do something wrong or unfair.' *Estate of Phillips, supra; Estate of Knutson,* [(1957), 275 Wis. 380, 82 N. W. 2d 196] . . ."

The will does not evince a coveted result. It is entirely natural for a man with an estate of this size to give some-

thing to those who cared for him the last six years of his life and to charities. One half of his estate he gave to the first cousins whom he had not seen for several years. First cousins have no legal or natural right to expect all the estate. We see no injustice in this disposition or any unreasonableness which would indicate undue influence.

It is argued that there was a breach of confidential relationship on the part of the attorney and therefore there is a presumption of undue influence. In the confidential-relationship cases the coveted result generally inured either directly or indirectly to the benefit of the confidant who exercised the undue influence. *Estate of Perssion* (1963), 20 Wis. 2d 537, 543, 123 N. W. 2d 465; *Estate of Barnes* (1961), 14 Wis. 2d 643, 112 N. W. 2d 142. There is no showing in this case the attorney influenced O'Loughlin to leave the legacy to the nursing home. The record does not show any relationship, professional or otherwise, between the attorney and the nursing home which might have motivated the attorney to act on behalf of the home. It is common practice for an attorney to urge his clients to make a will and in most cases to suggest possible beneficiaries, especially the natural objects of his bounty and charities. This is generally done in the exercise of an attorney's duties to discover the testator's intent in the planning and the drafting of the will. If this were not so, an attorney would be only a scrivener and not an advisor in this area of the law. A client has a right to full and disinterested advice. *State v. Horan* (1963), 21 Wis. 2d 66, 73, 123 N. W. 2d 488.

There may be cases where an attorney secures a legacy for another client through his confidential relationship with the testator and the inference of undue influence ought to apply, but that is not the fact in this case. The most the evidence shows is the guardian and the attorney advised the testator to make a will—good advice to a man with over $400,000 in worldly goods and no close

relatives. As to the nursing home, only one sister asked him what he was going to do with his money. The evidence is far short of showing undue influence.

This case presents a situation somewhat similar to that presented in *State v. Horan, supra.* In both cases legacies to several innocent beneficiaries were jeopardized by the claimed undue influence of another legacy. We should repeat what we stated in *Horan,* page 74:

"This state does not yet recognize the rule of partial invalidity in undue-influence cases. The injustice of the rule of total invalidity where only a separable part of the will is affected by undue influence is apparent. Under the doctrine of partial invalidity, the valid portions of a will may stand and be admitted to probate although other parts are denied probate because obtained through undue influence unless the provisions of the will are so interdependent that the valid cannot be separated from the invalid without defeating the general intent of the testator. 57 Am. Jur., Wills, p. 266, sec. 366; 3 Page, Wills (Bowe-Parker rev.), p. 26, sec. 26.11; Anno. Wills—Undue Influence—Effect, 69 A. L. R. 1129. Whether the rule should be modified is not now before us."

The trial court's findings are not against the great weight and clear preponderance of the evidence and its order admitting the will should be affirmed.

*By the Court.*—Order affirmed.