IN RE ESTATE OF EVANS, Deceased: ZELNER, and others, Respondents, v. KRUEGER, and another, Appellants.

*No. 75–830. Submitted on briefs March 8, 1978.—*
*Decided May 2, 1978.*
(Also reported in 265 N. W. 2d 529.)

For the appellants the cause was submitted on the brief of *Walker & Rehm* of Portage.

For the respondents there was a joint brief by *Arthur W. Swanson* of Portage, for personal representative; and by *Rogers & Owens* of Portage, for beneficiaries.

CONNOR T. HANSEN, J.    The appellants are adult daughters of the testator, John C. Evans, deceased. They filed objections to the admission of his last will and testament to probate on the grounds that he was suffering under an insane delusion, lacked testamentary capacity, and was unduly influenced by the beneficiaries.

The will, dated April 25, 1972, left his estate, of an approximate value of $32,000, to certain of his nieces and nephews. It made no provisions for his two daughters, Blanche, born in 1914, and Patricia, born in 1936.

Evans was born June 23, 1889; was educated through the sixth grade; and was married on October 29, 1913, to Dorathea Evans (hereinafter Dorathea). For the next forty-seven years, he and Dorathea worked a farm near Briggsville, Wisconsin. Their two daughters, who remained unmarried, resided with them and helped work the farm for many years without compensation. In 1960,

a land contract was executed for the sale of the farm, and the farm equipment was sold at auction. Evans, then seventy years old, told the buyers that he was getting too old to handle farm work. Following the sale of the farm, the daughters obtained fulltime employment off the farm for the first time. Until 1963, the Evans family continued to reside in the farm house, renting it from the buyers under the land contract. In 1963, they purchased and moved to a residence in nearby Briggsville.

Numerous witnesses testified that the Evans family appeared to be a close and loving family, and that they participated in many activities together. Beginning in approximately 1966, however, the family relationship became increasingly strained. The source of this strain is at issue.

The appellants contend that Evans' behavior underwent a sudden and irrational change, and that he became obsessed with an insane delusion that his wife and daughters were stealing his assets. The evidence shows that he became mistrustful of the financial records kept by his wife, and that he was convinced that money was being withheld from him. There is also evidence, however, that he was concerned about a lack of sexual relations with his wife, and that he attributed the family's troubles to the presence in the household of his daughters, particularly the older daughter, Blanche, whom he considered domineering.

Whatever the source of the trouble, it became serious. Evans repeatedly accused Dorathea of failing to account for family funds. At Dorathea's request, the family lawyer and a minister met twice with Evans and Dorathea to review the books kept by Dorathea. Although they found no errors, and attempted to persuade him that he was not being cheated, he remained unconvinced. Evans began demanding that his wife and daughters leave the family home. On one occasion, he excluded his wife and daughter from the family home by barring the door with

a shotgun. At another time Blanche returned home to find that her father had trapped her mother behind a bedroom door, and Blanche called the sheriff to release her.

Evans suffered from a number of medical problems and was hospitalized several times early in 1967. His hospital records show, among other things, that he was suffering from arteriosclerosis, and after his release from the hospital he mentioned to a friend that he had hardening of the arteries. His hospital records also show that he was very despondent about family problems.

In March, 1967, Evans was hospitalized for psychiatric evaluation. His medical records state that this hospitalization was the result of "a somewhat chaotic family situation," and that one of his daughters had called the hospital "and, in effect, demanded that the patient be hospitalized." These medical records also show that Dorathea informed the hospital staff that he had accused her of squandering funds, and that he verified the fact that he believed his wife and daughters had " 'plotted against him.' "

Upon his discharge, on March 18, 1967, Evans did not resume residence in the family home, but instead went to live with his brother, Louis, about four miles from Briggsville. He was later to state that he had been driven from his home. Twelve days later, on March 30, 1967, Dorathea commenced an action for legal separation. By judgment entered February 15, 1968, Dorathea was granted an absolute divorce, and the family property was divided equally between Evans and his wife.

Evans was soon convinced, and remained convinced to his death, that he had not received his full share in the division of the property. There followed an extensive and confusing exchange of correspondence in which his lawyer identified what Evans insisted were family assets in a total amount of $74,500, and in which Dorathea's lawyer offered detailed explanations of the vari-

ous items. It is sufficient to observe here that some of these claims were clearly erroneous, and that Evans denied receiving some payments even though cancelled checks and the testimony of disinterested witnesses show that the payments were in fact made. Nevertheless, he persisted in the belief that he had not received his half of the property.

Following the divorce, the daughters remained in the Briggsville house with their mother, who suffered from diabetes, which left her unable to work around the house. In June of 1968, part of her leg was amputated, and she was confined to a wheelchair. She died on June 25, 1970, and her entire estate was devised and bequeathed to the two daughters.

After the divorce, Evans lived with his brother, Louis Evans, for about two months. He then lived with his sister, Alice Ramsey, and her husband for approximately one year. Except for a short period before his last illness, when he lived with his nephew, Orville Evans, he lived the remainder of his life, slightly more than six years, by himself in a rented apartment in Briggsville. Although he saw his daughters often in Briggsville, he had little contact with them. He occasionally spoke with them on the street. They visited him a number of times in the hospital and were seen visiting with him while playing cards at parties and public gatherings. However, neither of them ever visited him in his apartment, allegedly for fear that he would accuse them of stealing.

Evans' health failed somewhat each year. Various witnesses testified that he showed a general loss of interest in life, that he became forgetful, and that he frequently became confused. He showed a lack of concern for his personal cleanliness. He lost weight, his eyesight became poor, he had difficulty breathing, and he sometimes fell. During February of 1972, while vacationing in Florida, he fell and broke several ribs and punctured a lung. He

was hospitalized for three weeks. In April, 1972, after returning to Wisconsin, he was hospitalized for one week and was diagnosed as having Hodgkin's Disease.

On April 25, 1972, five days after his release from the hospital, Evans visited Howard Latton, then a practicing lawyer, to have a will drawn. He had not met Latton before and did not see him again after that day. Latton testified that Evans told him he had been married and divorced, that the divorce had caused bitterness and that his two daughters had had nothing to do with him since the divorce. Evans told Latton that he had a previous will which made no provision for his daughters and which benefited certain of his nieces and nephews, but that he wanted to revise his will to provide greater benefit to certain other nieces and nephews who were close to him.

The earlier will, executed July 17, 1967, after Evans left the family home in Briggsville but prior to the judgment of divorce, made no provision for the wife or daughters, and left his entire estate in equal shares to his nephews, Harley Evans and Orville [Orvel] Evans, and to his nieces Eva Ramsey and Helen Treadwell. The will drawn by Latton on April 25, 1972, made no provision for his two daughters "for reasons which I consider sufficient." Instead, it left his estate to seven nieces and nephews.

Latton testified that he met with Evans for approximately seventy minutes in total; that Evans identified the intended beneficiaries, discussed the fact of his divorce, and also discussed burial plans. After the will was typed, Latton reviewed it with the testator, paragraph by paragraph, and asked him a series of questions to confirm that Evans had read the will and understood it; that it was as he wanted it; and that no one had influenced him in making it.

Latton also testified that it was his opinion, based on his observation of Evans, that he had a sufficiently active

memory to comprehend, without prompting, the condition of his property, his relation to his children and other possible beneficiaries, and the scope and bearing of his will; to perceive the relation of these things to each other; and to form a rational decision in reference to them. In forming this opinion, however, Latton apparently did not know that Evans had been discharged from a hospital only five days earlier. Although Latton formed an impression that Evans' assets were in the range of $20,000 to $30,000, he did not make a record of the assets of Evans and their value, and Evans apparently did not identify his property in detail. In addition, a memorandum prepared by Latton for his files recites that Evans said his wife had obtained a divorce "and that she and the two daughters got most of the property and since then the daughters have paid no attention to him." In fact, as previously stated, the divorce judgment had provided for an equal division of the property.

Following the execution of the will, Evans' health continued to fail. In May, 1972, he was hospitalized for a radical mastectomy which revealed a malignant lymphoma. His x-ray reports also showed "sclerotic changes," or hardening, of the aorta.

Evans died on September 22, 1974, at the age of eighty-five, and his last will and testament was subsequently admitted to probate.

Additional facts are set forth in discussion of the issues, which are:

1. Was the testator suffering from an insane delusion which materially affected his will?

2. Did the testator lack testamentary capacity?

3. Was the testator's will the product of undue influence by the beneficiaries?

After an extended trial and in a detailed memorandum decision, the trial judge found as facts that the will was not obtained as the result of undue influence, that Evans

was mentally competent when he executed the will, and that he was not affected by an insane delusion.

The findings of the trial court were based on conflicting evidence. The test on this appeal, therefore, is whether a judicial mind could, on due consideration of the evidence as a whole, reasonably have reached the same conclusions. This court will defer to the fact findings of the trial court, and they will not be upset on appeal unless they are clearly erroneous and against the great weight and clear preponderance of the evidence. *In re Estate of Taylor*, 81 Wis.2d 687, 696, 697, 260 N.W.2d 803 (1978).

The question on appeal is not whether this court would reach the same findings, but whether the findings should be affirmed as not being contrary to the great weight and clear preponderance of the evidence. *In Matter of Estate of Becker*, 76 Wis.2d 336, 346, 251 N.W.2d 431 (1977). On appeal this court examines the record, not for evidence to support findings which the trial court did not make, but for facts to support the findings which the trial court did make. *In Matter of Estate of Becker, supra*, at 347. Applying these standards to the record on this appeal dictates that the judgment admitting the will to probate be affirmed.

## *INSANE DELUSION.*

It has been stated that an insane delusion is a false belief which would be incredible to the victim if he were of sound mind, and from which he cannot be dissuaded by any evidence or argument. *Will of Riemer*, 2 Wis.2d 16, 19, 85 N.W.2d 804 (1957). The test of whether an erroneous belief is an insane delusion is whether a sane person could have formed such a belief from the evidence.

*Will of Wicker,* 15 Wis.2d 86, 112 N.W.2d 137 (1961);
*Will of Quam,* 10 Wis.2d 21, 102 N.W.2d 217 (1960);
*Will of Riemer, supra.*

In the present case, there does not appear to be any
substantial question but what Evans entertained a mis-
taken belief regarding the family finances. The trial
court stated in its opinion:

". . . The record is clear that beginning in, at least,
1966 Mr. Evans and his wife and daughters had continual
disagreements as to money. Mr. Evans believed that he
was not and did not receive all the property he had com-
ing. The record is also clear that he did receive all of
such money."

This finding of the trial court is amply supported by the
evidence.

The trial court concluded that this erroneous belief did
not constitute an insane delusion and thus invalidate the
will. However, in arriving at this conclusion, the trial
court emphasized that Evans' disposition of his property
could be explained by the fact that his wife had brought
a divorce suit against him, and that his daughters had
sided with his wife, leaving him to live alone and never
coming to visit him in his nearby apartment. Suspicion
and bitter accusations often attend divorces, the trial
court observed, and it was natural under such circum-
stances for a testator to remember those who were kind
to him in his last years.

It would be difficult to sustain the decision of the trial
court if it were based solely on the conclusion that the di-
vorce and the resultant attitude toward the daughters
overrode or negated the testator's delusions regarding
their role in the handling of the family finances prior to
the divorce.

In *Estate of Joslin,* 4 Wis.2d 29, 89 N.W.2d 822 (1958),
this court considered a will in which an elderly testatrix

had made no provision for her husband of fifty-five years. The testatrix had been afflicted with delusions that her eighty-year-old husband was carrying on adulterous relations with other women in their home after she had retired for the night. As a result of these delusions, the testatrix and her husband had made an equal division of their property some six years prior to the execution of the will.

The division of property did not alter the effect of the insane delusion or explain the exclusion of the husband from the will, this court held. The court said:

"The trial court, as a reason for holding that the insane delusion of Mrs. Joslin did not materially affect the testamentary disposition of her property whereby she bequeathed nothing to her husband, stressed the property division of 1947 which took place between the parties. However, the motivating cause for such property division was Mrs. Joslin's harboring of the delusion that her husband was squandering money on other women. This was what prompted her in denying him funds to carry on his business which in turn precipitated the property division. We thus consider it to be logically impossible to separate the delusions from the property division and to hold that one was a motivating force in the making of the will and not the other." *Estate of Joslin, supra,* at 34. *See also, Will of McGovern,* 241 Wis. 99, 3 N.W.2d 717 (1942).

By the same reasoning, where a divorce is logically inseparable from an insane delusion, or where the delusion is the motivating cause of the divorce, the divorce cannot be said to negate the effect of the delusions on a subsequent will.

In the present case there was persuasive evidence to support the contention that Evans suffered from an obsession that the family was secreting assets from him. However, an objector cannot succeed by merely showing that the testator had an insane delusion. A testamentary

document will not be disallowed unless it is also shown that the insane delusion materially affected the disposition embodied in the will. *Will of Quam, supra,* at 28, 29.

The daughters cannot prevail, therefore, unless it is reasonably certain that, but for the insane delusion, they would have received a materially larger portion of the estate. *See: Will of Wicker, supra,* at 90; *Will of Riemer, supra,* at 32. When the evidence shows that for other reasons the testator would have made the same disposition of his property in his will, the will should be admitted to probate, as was the will here.

The daughters rely on the *Will of Elbert,* 244 Wis. 175, 11 N.W.2d 626 (1943), in which this court affirmed a judgment denying probate of a will where the testatrix was influenced by the insane delusion that her children were stealing from her. There, however, this court emphasized that the delusion was ". . . the only possible cause for cutting off her children in the will. . . ." This court concluded that ". . . except for these insane delusions, there existed no ground of estrangement between her and her children and no other way to account for the disposition made of her property. . . ." *Will of Elbert, supra,* at 177.

In contrast, the record in the present case contains substantial evidence of other grounds for estrangement between Evans and his daughters. Therefore, it cannot be said that the great weight and clear preponderance of the evidence is contrary to the conclusion of the trial court that any insane delusion regarding the family finances did not materially affect the will.

The record contains considerable evidence that Evans attributed the breakdown of his marriage to the presence of his unmarried daughters, and particularly the older daughter, in the home. The bill of particulars, filed by his lawyer in the divorce proceedings, attributes the col-

lapse of the marriage to the allegedly domineering influence of the older daughter. The medical records of his hospitalization in 1967, for psychiatric evaluation, the testimony of his bookkeeper, the family lawyer and numerous other witnesses, attribute the source of the family breakdown to the presence of the two daughters in the home.

There is considerable credible evidence that he was treated unkindly by both daughters. The evidence does not compel the conclusion that Evans' feelings toward his daughters were groundless or that, in the same circumstances, a sane person would not have become estranged from his daughters.

On this record, the finding of the trial court that Evans' beliefs on money matters did not materially affect his will is not contrary to the great weight and clear preponderance of the evidence.

The daughters further argue that Evans' will was affected by a second insane delusion, and that he believed that Blanche was not his daughter. This argument is founded entirely on the purported testimony of Donald Hollman, the former family lawyer, in response to the question whether, in the trial of the divorce action, Evans ever testified to the effect that he was not the father of Blanche. The transcript prepared by the court reporter showed no answer to this question.

The daughters have moved to insert the answer "yes" to conform to what they contend was the answer of the witness. Five affidavits, including an affidavit of the witness, have been filed in support of this contention. In addition, the contention is supported by the fact that after the question was asked, the daughters' lawyer offered Blanche's birth certificate and other statements of Evans showing that he was in fact her father. The trial court entered an order denying the motion to amend the transcript, and the daughters ask that this order be reversed.

It is unnecessary to determine whether the order of the trial court was erroneous because, even if Hollman did testify that Evans once gave testimony "to the effect that" Blanche was not his daughter, this would not constitute sufficient evidence to establish an insane delusion.

An insane delusion is a belief from which the victim cannot be dissuaded by any evidence or argument. *Will of Riemer, supra,* at 20. A belief must have a rigid or persistent quality, and must be unreasonably adhered to, over time, if it is to assume the status of an insane delusion.

Even if it is assumed that Evans once denied that Blanche was his daughter, the record is devoid of any indication that he persisted in any such belief or that he ever repeated it. On the contrary, the record is replete with accounts of his statements about his "daughters," Blanche and Patricia. There is therefore no basis for the argument that he was subject to an insane delusion that Blanche was not his daughter.

### TESTAMENTARY CAPACITY.

The requirements for testamentary capacity were set forth in *Estate of O'Laughlin,* 50 Wis.2d 143, 146, 147, 183 N.W.2d 133 (1971):

"The testator must have mental capacity to comprehend the nature, the extent, and the state of affairs of his property. The central idea is that the testator must have a general, meaningful understanding of the nature, state, and the scope of his property but does not need to have in his mind a detailed itemization of every asset; nor does he need to know the exact value of his property. A perfect memory is not an element of a testamentary capacity. 1 Page, *Wills* (Bowe-Parker), p. 617, sec. 12.12. The testator must know and understand his relationship to persons who are or might naturally or reasonably be expected to become the objects of his bounty from which

he must be able to make a rational selection of his beneficiaries. He must understand the scope and general effect of the provisions of his will in relation to his legatees and devisees. Finally, the testator must be able to contemplate these elements together for a sufficient length of time, without prompting, to form a rational judgment in relation to them, the result of which is expressed in the will." *Accord, In Matter of Estate of Becker, supra,* at 344.

The trial court found that Evans met these requirements at the time his will was executed. The trial court acknowledged that the testator had shown some confusion regarding his estate and the property to which he was entitled under the divorce judgment, but found that this confusion was explained by the infirmities of age, by the fact that divorces often produce confusion regarding the extent of the couple's estate, and by the fact that Dorathea had kept the family's records. Although Evans suffered from a number of serious diseases, including generalized arteriosclerosis, the trial court found that these diseases had not rendered him incompetent to make a will. ". . . Except for the infirmities of age," the trial court concluded, ". . . he lived a normal life for a person in his position in life."

The daughters challenge these conclusions on several grounds. The first ground concerns the general physical condition of Evans. They rely on the medical opinion of Dr. W. J. Focke, who testified that, in his opinion, Evans did not have testamentary capacity to make a will on April 25, 1972.

Dr. Focke had never met Evans, and his opinion was based entirely on a review of the medical records of Evans and on an elaborate set of assumptions about his behavior which required Dr. Focke to assume the credibility of certain testimony by the daughters. Under these circumstances, Dr. Focke's testimony is entitled to less

weight than it would receive if he had personally observed the patient.

The daughters contend that because Dr. Focke's testimony was unimpeached, it cannot be disregarded. However, this court has rejected the proposition that in all cases the testimony of a physician in respect to competency should be preferred to that of an attesting witness who is a lawyer. *In Matter of Estate of Becker, supra,* at 345, 346. In this case, Latton, who drew the will and witnessed its execution, testified that it was his opinion that Evans had testamentary capacity.

This opinion was based on his observation of Evans at the time the will was executed, and on the fact that Evans was able to answer questions, identify beneficiaries, and explain the reason for the exclusion of his daughters. Latton testified that he reviewed the will paragraph by paragraph with the testator. The testimony of Latton was therefore focused on the very time when it was necessary for the testator to demonstrate testamentary capacity. Dr. Focke's testimony, in contrast, was necessarily directed only to Evans' general mental capacity, which is only peripherally relevant, because a testator may have testamentary capacity during lucid intervals in a general condition of incompetency. *In Matter of Estate of Becker, supra,* at 345.

Florence Stolte, Evans' bookkeeper and personal representative under the will, testified that she arranged the appointment with Latton and accompanied Evans to the appointment. She testified that Evans was in good mental condition and had a clear memory that day, and that after the will had been executed, he told her that it was just as he wanted it.

Evans did suffer from arteriosclerosis, but even advanced arteriosclerosis will not necessarily make a testa-

tor incompetent to make a will. *See: In re Estate of Kamesar,* 81 Wis.2d 151, 159, 160, 259 N.W.2d 733 (1977); *Estate of O'Loughlin, supra,* 147. Nor do the general infirmities of old age, including forgetfulness and occasional confusion, incapacitate a testator from making a will. *In re Estate of Kamesar, supra,* at 159, 160. Nor is incompetency established by the fact that Evans was rigid in his thinking or set in his ways. An examining physician observed: "He is stubborn re things he feels strongly about & is an individualist in the old sense." Hard-headedness is not synonymous with incompetence.

Disinterested witnesses testified that Evans appeared to be mentally alert, that he had no trouble concentrating, that he carried on intelligent conversations, and that he did not seem absent-minded.

The daughters also point to evidence that their father was unable to manage his business affairs. This evidence includes the testimony of a number of witnesses that he denied having received various payments which he had, in fact, received; that he had difficulty comprehending that certain living expenses had to be paid; that he misplaced money, bills, and a savings passbook; that he neglected to cash a large check; and that he generally had difficulty understanding his business affairs.

This evidence is relevant, but it is not dispositive. To establish testamentary capacity it need not be shown that a testator was able to handle his business affairs without assistance. Rather, the central idea is merely that he must have a general, meaningful conception of the nature, extent and scope of his property and the natural objects of his bounty. *Estate of O'Loughlin, supra,* at 146, 147; *Estate of Von Ruden,* 55 Wis.2d 365, 371, 372, 198 N.W.2d 583 (1973).

The daughters argue that their father was unable to comprehend the nature and extent of his property. They

rely on the testimony of William Foote, a farmer who had known Evans for many years, who testified that he doubted very much whether Evans knew what assets he had. They also rely on the testimony of Florence Stolte, the personal representative, who assisted their father with his business affairs, that he could not have listed the various things he owned and their value. The remainder of Stolte's testimony makes clear, however, that she meant only that Evans could not have compiled a complete and exact list of all his assets from memory.

This testimony does not invalidate his will. A testator is not required to know the exact value of his property, or to itemize and detail his assets. *Estate of Von Ruden, supra,* at 372. In fact, this court has recognized that very few people do know the exact value of their assets or the exact amount of money in their bank accounts at any given time. *Estate of O'Loughlin, supra,* at 148.

Florence Stolte testified that Evans knew that he owned certificates of deposit in the Oxford Bank, and that he told her he had approximately $25,000 in various bank accounts and certificates of deposit. A list of his assets compiled after his death, including a life insurance policy valued at slightly more than $1,500, showed a total value, at the time of his death, of $32,064.28. This total is not unreasonably in excess of Evans' own estimate.

The daughters also point to the fact that Latton prepared no enumeration of Evans' assets, which they interpret as evidence that Evans was unable to provide the information. However, Latton testified that this definitely was not the reason he did not itemize the assets, and that itemization was unnecessary considering the size and liquid nature of the assets. From his meeting with Evans, Latton gained the impression that the assets had an approximate value of $20,000 to $30,000.

This evidence supports the conclusion of the trial court that Evans had a meaningful understanding of the nature, extent and state of his property. There is no serious question that he understood his relationship to potential beneficiaries, that he understood the effect of his will, and that he was able to contemplate these elements together. It cannot be said that Evans lacked the testamentary capacity to make a will on April 25, 1972.

## *UNDUE INFLUENCE.*

The daughters maintain that the will was the product of undue influence by the beneficiaries, who were various nieces and nephews of the testator with whom he had contact after being divorced and during the last eight years of his life. In this case the daughters, as objectors, were required to prove four elements in order to establish undue influence: susceptibility to undue influence, opportunity to influence, disposition to influence, and coveted result. *In re Estate of Taylor, supra,* at 699; *In re Estate of Kamesar, supra,* at 158.

These elements must be proved by clear, satisfactory and convincing evidence, although this rule is qualified to the extent that, when three of the four elements are established by such proof, only slight evidence is necessary to establish the fourth element. *In Matter of Estate of Becker, supra,* at 347, 348.

In determining whether these elements were established by the evidence adduced at trial, it is important to bear in mind that on July 17, 1967, Evans executed an earlier will in which his entire estate was bequeathed to four nephews and nieces. As early as July, 1967, therefore, only four months after leaving the Briggsville

house, and before trial of the divorce action, he had expressed an intention to disinherit his daughters in favor of nieces and nephews. This fact is significant in gauging the opportunity of the nieces and nephews to influence the will of Evans, and his susceptibility to such influence.

The only evidence that Evans was susceptible to being influenced was the testimony of Dr. Focke, who never met him. In contrast to this was the unanimous testimony of those who knew the testator that he was strong-willed, stubborn and independent. Apart from the testimony of Dr. Focke, there is no evidence that ill health weakened Evans' independence of mind. On the contrary, the evidence shows that he was resolute and strong-willed until his death. This conclusion is fortified by the fact that his earlier will, executed when he had been separated from his family for only four months, and before the physical deterioration of later years, had made no provision for his daughters. The finding that he was not susceptible to undue influence is therefore supported by the evidence.

There is no dispute that the beneficiaries had an opportunity to influence the testator.

The third element is a disposition to influence. This means more than a desire to obtain a share of the estate, it implies grasping and overreaching, and a willingness to do something wrong or unfair. *In re Estate of Taylor*, *supra*, at 700; *In re Estate of Kamesar*, *supra*, at 161. The fact that his nieces and nephews took Evans into their homes does not, as the daughters argue, demonstrate a desire to create a sense of obligation. It is just as reasonable to conclude that they took him in and cared for him because, as one nephew testified, "he had no one else." This court has repeatedly said that there is nothing wrong with aiding and comforting a failing testator, and indeed, that such conduct should be encouraged. *Estate of Hamm*, 67 Wis.2d 279, 290, 227

N.W.2d 34 (1975) ; *Estate of McGonigal,* 46 Wis.2d 205, 214, 174 N.W.2d 256 (1970).

The daughters argue that the beneficiaries were not close to Evans before 1967. They also point out that the beneficiaries made little effort to bring Evans and his daughters together, although one niece did call the daughters to inform them of their father's last hospitalization. This evidence does not suggest grasping or over-reaching.

The record does contain circumstantial evidence which might tend to show a disposition to influence Evans to disinherit his daughters. There was testimony that some of his nephews incorrectly told him that he had not been paid $5,000 to which he was entitled. The daughters' lawyer also offered evidence from an adverse examination of the personal representative to show that one of the nephews had telephoned her the evening of Evans' death, inquiring about Evans' tools and asking whether she knew about money which Evans had taken into the hospital with him. Further, when the daughters contested their father's will, one of the nieces suggested that the beneficiaries file claims against the estate for their services to the testator in order to consume the estate.

This evidence could be interpreted as tending to show a grasping disposition. On the other hand, this evidence, for the most part, concerns events after the execution of the will. Moreover, the behavior of the beneficiaries may be normal and predictable in light of the bitter division within the family, the mutual suspicion which followed the separation, and Evans' expressed desire that his property not go to his daughters. The great weight and clear preponderance of the evidence therefore does not demonstrate a disposition to unfairly influence the testator.

The fourth element of undue influence is the requirement that the will achieve a coveted result. This element concerns the naturalness of the disposition. *In re Estate of Kamesar, supra,* at 163. The mere fact that a will benefits the alleged influencer does not prove the coveted-result element. *In Matter of Estate of Becker, supra,* at 348.

A will which excludes a natural object of the testator's bounty raises a "red flag of warning," *Estate of Culver,* 22 Wis.2d 665, 673, 126 N.W.2d 536 (1964), but that fact alone does not make the disposition unnatural where the record shows logical reasons for such a disposition. *In re Estate of Kamesar, supra,* at 163.

Thus, where the record shows that a testator was alienated from the natural objects of his affection or felt that they had abandoned him in his hour of need, a will may be natural even though it makes no provision for them. *In re Estate of Taylor, supra,* at 700, 701. The record in this case shows that the testator had become estranged from his daughters and that this estrangement was independent of any influence of his nieces and nephews. In view of the fact that he was taken in and cared for by his nieces and nephews, it is not unnatural or unexpected that he would bequeath his estate to them. The evidence therefore does not support the argument that the will achieved a coveted result reflecting the influence of the beneficiaries.

The elements of undue influence are not established by the great weight and clear preponderance of the evidence. The finding of the trial court that the will was not the result of such influence is affirmed.

*By the Court.*—Judgment affirmed.