ESTATE OF KAIMAN: KAIMANN, Appellant, v. GOODSITT and another, Respondents.

*March 6—April 4, 1961.*

For the appellant there was a brief by *Eisenberg & Kletzke* and *Kenneth Z. Kaiman,* attorneys, and *Roland J. Steinle,*

*Sr.,* and *John W. Bernard* of counsel, all of Milwaukee, and oral argument by *Mr. Sydney M. Eisenberg* and *Mr. Steinle.*

For the respondents there was a brief by *Raskin, Zubrensky & Padden,* attorneys, and *Max Raskin, William F. Quick,* and *Leonard S. Zubrensky* of counsel, all of Milwaukee, and oral argument by *Max Raskin* and *Leonard S. Zubrensky.*

BROWN, J. The weight to be given to conflicting evidence bearing upon testamentary capacity is for the trial court. The party contesting a will because of alleged lack of testamentary capacity has the burden of proving the incapacity by clear and satisfactory evidence. *Estate of Knutson* (1957), 275 Wis. 380, 82 N. W. (2d) 196. It is elementary that the question of competency is to be determined as of the time of the execution of the will. Id. Findings of fact by a trial court are not to be set aside unless they are contrary to the great weight and clear preponderance of the evidence and where there is a dispute in the testimony the trier of the fact is the judge of the weight and credibility to be accorded to the testimony of the witnesses. *Estate of Fillar* (1960), 10 Wis. (2d) 141, 102 N. W. (2d) 210, and cases therein cited.

We have here for consideration a will which shows on its face that it was obviously drawn by a draftsman conversant with the requirements of the testamentary disposition of an estate and able to express the desires of the testator in clear, unambiguous language. That draftsman was the testator himself.

The will was witnessed by persons who were familiar with the legal requirements of valid wills. They were well acquainted with the testator. The witness, Goodsitt, at least, saw the testator almost every day and discussed with him topics of general and professional interest. Both witnesses

testified that they considered Jacob Kaiman to have testamentary capacity at the time when he signed his will. Their testimony did not disclose that they had any belief that he was ever incompetent to make a will. Starting with nothing, he had amassed a fortune. He managed his own business affairs, in the practice of law and as a realtor. He was accepted by his religious body to participate officially in that group's services.

The proponent thus presented to the trial court a very persuasive case for the admission of the will to probate. The trial court so allowed it and the appellate court may not reverse unless the objector's evidence is so strong that the trial court's finding that Jacob Kaiman had testamentary capacity at the time the will was signed is a finding contrary to the great weight and clear preponderance of the evidence.

Most of the evidence of objector's witnesses concerned the eccentric behavior and mode of life of the testator. Although he was actually well off, he lived in cramped and squalid quarters surrounded by filth and disorder. He would not buy himself proper, nourishing food. His clothing was old and dilapidated. He would not keep his clothing or his person clean. There is much testimony that he smelled bad. When he wanted feminine companionship he patronized what he identified as "two-bit whores," and he cheated them out of their wages. His aunt and his cousin reproached him for his manner of life and urged him to conform to higher standards. In reply sometimes he said he could afford nothing better. At other times he said he liked it that way. They concluded that he must be crazy to live like that unnecessarily and they so testified.

A witness who had been a tenant in an apartment which Kaiman owned testified that Kaiman harassed him by making inconvenient inspections of the premises at unreasonable hours. The tenant was in default in his rent and the landlord's attitude and behavior were not friendly. The wit-

ness concluded that Kaiman was crazy. Another tenant with whom Kaiman had a dispute reached the same conclusion.

By the foregoing testimony and other evidence to like effect, it appears that Jacob Kaiman was an unattractive person but not one who is shown to be incompetent to make a will.

However, there is testimony which bears more closely on the question of testamentary incapacity. Two witnesses testified that Jacob informed them that the Nazis had executed his relatives at Dachau and that Jacob had seen the executions. None of this was true. At another time, in 1958, Jacob told the witness, his aunt, that his brother Benno was killed in a car accident. He told others that he had no brother. He told witnesses that he had no family and was alone in the world. From time to time Kaiman saw Benno, his aunt, and his cousin, Bernard, and could not be misinformed of their existence or identity. There was testimony that Jacob talked to himself and that he heard imaginary voices.

The testator's cousin, Bernard Kaiman, is a psychologist. He questioned Jacob concerning Jacob's mental processes and reached a conclusion that Jacob had hallucinations, that he heard nonexistent voices and that his mind had deteriorated to a point where he lacked testamentary capacity. Another witness, a Dr. Kasak, a psychiatrist (who had never examined Jacob), in response to a hypothetical question, testified that in his opinion to a reasonable medical certainty Jacob Kaiman was insane on the date of the execution of the will and that he was then incompetent to sign a will. On cross-examination the doctor said he believed Kaiman had been insane for at least ten years.

It must be conceded that Jacob Kaiman was not on good terms with his brother, Benno, the appellant, but any contention that Jacob believed on the day when the will was signed that Benno was dead, no matter what he may have told others at other times, or whether he believed what he

was telling them, is conclusively refuted by the will itself by the bequest "to my brother Benno George Kaimann."

We must agree that the record sustains the learned trial judge in his determination that, under the circumstances, the will is a natural one and on the day in question the proof is overwhelming that the testator was competent to make a will. It is, of course, unnecessary to go so far; it is sufficient that the trial court's finding of competency at the time the will was executed is not contrary to the great weight and clear preponderance of the evidence.

The evidence gives sufficient support to the trial court's finding, but we must still examine appellant's contention that he was unduly and erroneously limited by the trial court in the number of witnesses which he was permitted to call.

At the outset of the objector's case, when his counsel announced that he would call 50 witnesses, Judge MORRISON informed him that he would be limited to five witnesses to any one issue. Later the court increased the number to six witnesses to the question of the testator's mental competency. Counsel replied that he could not begin to present that feature of the case with fewer than 14 or 15 witnesses. In fact, the court further relaxed the limitation by permitting the testimony of a photographer to show by exhibits the disorder of Jacob Kaiman's dwelling, and by permitting the expert testimony of Dr. Kasak, the psychiatrist, in addition to the other six witnesses who testified for appellant upon the testator's mental competency.

Trial courts quite generally limit the number of witnesses testifying on the same issue, but guides to the court's discretion in that respect have not been specifically determined by Wisconsin decisions. In the three cases which counsel refers us to, the court was sustained in limiting the number of witnesses who might testify to a single fact: *Meier v. Morgan* (1892), 82 Wis. 289, 52 N. W. 174, concerned the proper packing of ice against the wall of a building;

*Larson v. Eau Claire* (1896), 92 Wis. 86, 65 N. W. 731, description of a rut in a highway; and *J. H. Clark Co. v. Rice* (1906), 127 Wis. 451, 106 N. W. 231, the utility of a device covered by a patent. Appellant submits that a limitation may be upheld where a single fact is to be established but that *no* limitation may be made by the trial court to the number of witnesses testifying to the main issue. The general rule stated in 88 C. J. S., Trial, p. 202, sec. 92 b., is:

"It is the general rule that the trial court may not limit the number of witnesses as to a main, controlling, and controverted fact or issue."

Decisions each way on that point are given in the annotation collected in 21 A. L. R. 335, and pages following. We consider the best-reasoned cases hold that a trial court should not set an arbitrary limit to the number of witnesses which a party may call to prove a main issue or controlling issue. Even so, we do not think the law requires a trial court to hear evidence which is merely repetitive and cumulative even on a controlling issue. At some point, which will depend on the circumstances of a particular case, a trial court must have discretion to end the procession of witnesses on issues already adequately covered.

In the case at bar we conclude that the trial court's preliminary announcement that the objector to the will could call no more than five witnesses to the controlling issue of testamentary capacity was error, but whether it remained error and is prejudicial is another question. The record shows that the court quickly extended permission to call six witnesses on that issue. Then, when appellant had called six witnesses who testified to their observations of what appellant describes as the testator's peculiar and bizarre behavior, appellant offered as a witness the psychiatric expert. The trial court allowed the expert to testify and to do so at length. Obviously this testimony was not repetitive of that which had gone before and the court promptly heard the witness

although appellant had exceeded the limitation previously set. We think it would have been prejudicial error if the testimony of this expert had been excluded because counsel had exhausted the prescribed number of witnesses. This testimony brought something new to the issue of mental capacity. The court took this evidence in spite of the court's announced limitation of witnesses. It would have been error not to do so. But it would not have been error for the court to refuse to hear more witnesses to tell that Jacob Kaiman was crazy because he smelled bad, spent little money on himself, and was otherwise a disagreeable sort of person.

When appellant asked to call the psychiatric expert, the court permitted it and did not enforce the numerical limitation. If appellant had other witnesses whose testimony would have added something different from what the court had heard from the original six, his counsel did not say so. With no offer of proof as to what appellant's additional witnesses would testify to, we cannot say that any prejudice resulted to appellant from the exclusion of those witnesses whom appellant says he could have called if there had been no limit.

Therefore, while we disapprove an announcement by a trial court that he will hear no more than a designated number of witnesses upon a main or controlling issue and an enforcement of that limitation under some circumstances might well constitute prejudicial error, in the instant case the appellant has not shown that any error prejudicial to him resulted from the trial court's exclusion of further testimony.

Our study of the record convinces us that the decision of the trial court that Jacob Kaiman was competent to make a will at the time when he made it was not contrary to the great weight and clear preponderance of the evidence. The order admitting the will to probate will be affirmed.

*By the Court.*—Order affirmed.