Estate of Dobrecevich : Dobrecevich, Appellant, v.
Brandt, Respondent.

*May 4—June 6, 1961.*

84

For the appellant there was a brief by *Snyder, Mantyh & Arndt* of Milwaukee, and oral argument by *William J. Mantyh*.

For the respondent there was a brief and oral argument by *John J. McLario* of Menomonee Falls.

Brown, J.

### Execution of the Will.

The document was signed by Rade Dobrecevich at the Farmers & Merchants Bank in Menomonee Falls, Waukesha county, on March 31, 1954, in the presence of Robert Goode and Bernard Bellin, who were officers of the bank for many years. These officers testified that Dobrecevich and the two witnesses all signed in the presence of each other. Mr. Bellin testified directly that he remembered Rade's statement to the witnesses that this paper was his will.

The objector's contention is that the witnesses had no present recollection of the execution of the will, that the attesting witnesses did not read the will and could not now say that they knew this to be a will at the time they witnessed it, and they did not read the attestation clause and therefore there was no presumption of fact in the declarations of the standard attestation clause. Whether they read the attestation clause or not, both bank officers testified that they were accustomed to act as witnesses to wills and that they knew

this was a will presented to them to be witnessed. It is extremely improbable that bank officers would put their names to documents about whose nature and purpose they did not know and understand, in addition to which the testimony, particularly of Mr. Bellin, shows that Rade published and declared this paper to be his will and asked them to be witnesses to his signing it. There is no contrary testimony and the appellant's objection to this feature of the case rests only on an inference that the witnesses could not have remembered the transaction. The court did not draw that inference but did believe the witnesses. The court's finding that the execution conformed to the statute, sec. 238.06, was sufficiently proved.

### Testamentary Capacity.

The decisions dealing with testamentary capacity are so numerous and the law so well established that it hardly seems necessary to review them again at length. The question of competency to make a will is to be determined as of the time of the execution of the will; the credibility of witnesses and the weight to be given to their testimony are matters for the trial court, as are the inferences to be drawn from the evidence. The findings of the trial court must be affirmed unless contrary to the great weight and clear preponderance of the evidence. *Estate of Fuller* (1957), 275 Wis. 1, 81 N. W. (2d) 64. The party contesting the will because of alleged lack of testamentary capacity has the burden of proving the incapacity by clear and satisfactory evidence and the question of mental competency is to be determined as of the time of the execution of the will. *Estate of Kaiman* (1961), 13 Wis. (2d) 201, 108 N. W. (2d) 379.

As witnesses to establish Rade Dobrecevich's incompetency, the objector called his brother and his two sisters, as

well as numerous other witnesses, all of whom testified that Rade drank heavily and when drunk behaved in a most disorderly manner. In this respect the effect of such testimony is very similar to that on the issue of testamentary capacity in the *Kaiman Case, supra*. It may be conceded that a fastidious hostess would not want Rade to be her house guest but this testimony bears little relationship to the testator's competency to make a valid will distributing his property after death. Neither is there much probative force in the fact that in the years after the will was executed Rade's drinking habits got worse and a year and half after the date of the will his children determined that he was wasting his money and they thought it advisable that he should be put under guardianship as a spendthrift. On the petition of his daughter, Anna, the Waukesha county court, November 1, 1955, found Rade to be incompetent to have the care and management of his property because of his being an habitual drunkard and spendthrift and letters of guardianship were issued to Anna Brandt. Long ago we determined that the mere fact that a person is under guardianship as to his person and property does not incapacitate him to make a valid will. *Will of Slinger* (1888), 72 Wis. 22, 37 N. W. 236. The distinction between incapacity to handle his finances and incapacity to comprehend the conditions of his property, his relationship to the natural objects of his bounty, and the disposition actually made of his property by a will still holds good.

The objector also charged that Rade suffered from insane delusions and that such delusions produced the distribution which the will made in the estate. No delusions whatever are in evidence. The objector has attempted to work the problem backwards by a course of reasoning which starts by a will unsatisfactory to the objector, from which he argues that the testator must have been motivated by an insane delusion that the children, other than Anna, persecuted him and he re-

sented it. There is no testimony that Rade had any such thoughts or beliefs.

Under the evidence adduced in the trial of this case we find no merit in objector's contention that Rade lacked testamentary capacity.

### Testator's Ability to Understand the Will.

The objector also submits that even if Rade's competency was such as to enable him to make a valid will there is insufficient proof that he did intentionally and understandingly make this will. This rests on a theory that Rade, who was of Serbian birth, could not communicate satisfactorily in the English language and, therefore, Rade was not able to express his wishes to the scrivener who drafted the will and who understood and spoke only English, nor could Rade understand the will when the scrivener read it back in English to him nor could he read the will for himself. It must be conceded Rade could not have read the will but it is not one difficult to understand. The scrivener, Attorney Higgins, testified that he was able to understand what Rade wanted and that Rade understood the will which Higgins prepared and read to him. Numerous other witnesses called by Anna, the proponent, testified that Rade could understand and be understood in the English language when conversing on simple subjects. He could make purchases in stores and argue about his tax bills. Such witnesses testified that Rade was able to express himself in English and to understand what was said to him in English in the everyday pursuits of his life.

Rade came alone to the office of Attorney Higgins to have a will prepared and it was Rade and no one else who told Higgins how the property should be distributed. Inspection of the will shows that Rade was able to tell Higgins who his

children were and their addresses. The will omitted none of them. (Helen Lucas is one of Rade's married daughters.) In fact, except for the size of the respective bequests, the objector does not contend that Rade did not communicate accurate information to the attorney whom he asked to prepare the will.

A few days after the first interview, Rade came to the attorney's office to sign the will, when Higgins told him the will would be ready. Evidently Rade had understood the necessity of this second visit. This occurred in the evening and there were no available witnesses, so Mr. Higgins gave Rade the will, told him to get two good men to be witnesses and when he and the witnesses had signed the will he should mail it back to Mr. Higgins in an envelope which Higgins gave Rade for the purpose. The next day Rade asked his daughter, Anna, if she could take him to two good men to be witnesses to a paper which he was going to sign. Anna said that she was going to the bank and would take him there. The trip to the bank and the execution followed as already described. When the signing had been attended to, Rade asked Anna where he could mail the paper back to Mr. Higgins and Anna took him to the Menomonee Falls post office and pointed out the place where the envelope could be deposited. The will reached Mr. Higgins in the mail in due course. It appears, therefore, that Rade was able to understand the instructions which Mr. Higgins had given him and that he followed the instructions exactly. There can be no question but what Rade could understand Mr. Higgins in that matter and there is not the slightest reason to suppose that Rade did not understand the very simple bequests which Mr. Higgins testified that he read to Rade and that the written will expressed Rade's wishes.

We conclude that the testator had testamentary capacity in general and, particularly, at the time of the preparation and

the execution of the will, and was able to communicate his wishes to the scrivener and to understand and approve what the scrivener had written for him in respect to the testator's directions.

*Undue Influence.*

The objector submits that Anna exerted undue influence or fraud in persuading Rade Dobrecevich to make a will giving the largest share of the estate to her instead of the equal division of property which the objector (and Rade's other three children) would have preferred. The law is well settled in Wisconsin, recently stated once more in *Estate of Fuller, supra,* that to invalidate a will as the product of undue influence the person so contending must prove by clear, satisfactory, and convincing evidence that the testator is a person unquestionably subject to undue influence; that the person charged with exerting such influence has a disposition to influence the testator unduly for the purpose of procuring improper favor; that the influencing person has opportunity to exercise such influence and effect the wrongful purpose; and that a result clearly appears to be the effect of the influence.

Before Anna was married and was still living in the home of her parents, these were the depression days of the 1930's. Anna was the only child who was working and Anna gave to her parents her entire pay check during that period. When Mrs. Dobrecevich died, December 27, 1953, Rade continued for a time to live in his old home but he was lonely and depressed and indulged in even more drinking than had been his previous custom. In January of 1954, Emil took Rade into his own home and helped Rade in renting Rade's home to a tenant, and Emil also employed Rade in his contracting business. After living in Emil's home a month or so there

is disputed evidence, which the court could believe, that Rade became too difficult for Emil's wife to put up with any longer, on account of Rade's drunkenness, and Rade was told he was not wanted any longer. Emil's wife said that Rade would have to go or she would leave. Whether or not that was the cause of departure, Rade moved to a hotel where Anna found him the next day. She took him to her home, where Rade lived for about the next ten months, beginning about the end of February, 1954. He had been there approximately a month when he made his call on Mr. Higgins to make the will in which he declared that "[Anna] has been good and kind to me during my life and she cared for me after the death of my wife." There is much evidence to substantiate the truth of this recitation and there is no slightest incident to support a contrary conclusion.

With Rade living in the home of Anna and her husband, Anna of course had *opportunity* to exert undue influence upon Rade if she was *disposed* to do so. The trial court found that there was no proof of such a disposition. Rade was unable or unwilling to live in Emil's home and Anna took the old man in, kept him, and permitted him to live with her and her husband even though evidence supplied by the objector amply demonstrates Rade was a most difficult and displeasing visitor. It is no wonder that Rade formed a kindly feeling toward Anna and perhaps one more favorable to her than to the other children who had not been as forbearing but such an example of filial devotion is not an exercise of undue influence.

There is no evidence that Anna ever had any communication with her father about the making of his will or what the will should contain. She did not send Rade to a lawyer to have a will drawn. Rade went to Mr. Higgins' office by himself on each of the two occasions when the will was being prepared and approved. Rade did not even tell Anna that

he had drawn a will and wanted to have it executed. He only told her that he wanted to sign a paper and would like to have her recommend some responsible witnesses. Although Anna denied that she knew Rade had made a will, it is a fair inference that Anna knew that this paper was a will, either at the time of the execution or shortly thereafter, but there is no evidence at all that Anna knew anything concerning the various bequests.

All the children came to see their father at Anna's home as often as they pleased. Rade came and went as he pleased. Rade lived in Anna's home until late in 1954 or early in 1955. He then moved in for a short time with his daughter Helen Lucas and stayed there until March of 1955, and then went back to his own home. Rade was arrested for drunkenness in October, 1955, and thereafter Anna took her father back into her home where he stayed until a few days before his death as a result of a stroke on May 9, 1959. In all this time Rade had complete control of his own movements, except when he was in jail on the drunkenness charge, but at no time is there any evidence that he was dissatisfied in the disposition of his property as expressed in his will.

We concur in the trial court's conclusion that appellant has failed to prove that Anna was disposed to exert undue influence.

### *Susceptibility to Undue Influence.*

The record failed to convince the trial judge by clear, satisfactory, and convincing evidence that the testator was unquestionably subject to undue influence. If the testator's character was so subject we might expect appellant to give us examples of instability in the testator's decisions once arrived at, or other responses to the advice or requests of others. Such examples are lacking. Except for the appellant's con-

clusion that Rade responded to Anna's disposition to exert undue influence, which we have just said has not been proved, the objector does not cite instances when Rade was dominated by anyone. As far as the record shows he was self-willed and stubborn to an unpleasant degree. He did as he pleased. Appellant stresses Rade's addiction to liquor to reinforce the contention that the testator was susceptible to the influence of others. Appellant does not identify any person who ever influenced Rade to drink or otherwise conduct himself contrary to his natural inclination. On the contrary, the objector and his witnesses made every effort to induce Rade to abstain or at least reduce his drinking. All to no avail. A man of weaker will and character subject to domination by others might well have succumbed to the urging of his children to swear off, at least temporarily, but not Rade Dobrecevich. He resisted all persuasion which conflicted with his own desires.

We must concur in the able analysis of the testimony by the learned trial court and in its conclusion that the objector has not met the burden of proof that Anna was disposed to influence the testator unduly or that the testator was unquestionably subject to an exercise of undue influence. Accordingly, and we quote from the opinion of the county court,

". . . the will having been duly executed by a testator having testamentary capacity and having understanding as to its contents such as the law requires and such will not having been executed as the result of undue influence upon testator, such will is entitled to admission to probate."

*By the Court.*—Order affirmed.