IN RE ESTATE OF FECHTER, Deceased: Eileen RAHR and Pauline Marie Rahr, minor, by her Guardian ad Litem, Appellants, v. EAST WISCONSIN TRUSTEE COMPANY, Personal Representative of the Estate, and others, Respondents.

Supreme Court

*No. 76–268. Submitted on briefs February 28, 1979.—Decided March 27, 1979.*
(Also reported in 277 N.W.2d 143.)

202

For the appellants the cause was submitted on the briefs of *Muchin & Muchin, S.C.,* of Manitowoc.

For the respondents the cause was submittted on the brief of *Nash, Spindler, Dean & Grimstad* of Manitowoc.

BEILFUSS, C. J.   The challenge to the order admitting the will and the codicils to probate is primarily upon the grounds (1) that the testatrix lacked sufficient mental capacity to make a will, and (2) that the will and the codicils were the product of undue influence.

The objectors to the will and codicils were Eileen Rahr, widow of decedent's nephew Paul, and Pauline Marie Rahr, grandniece of the testatrix and principal surviving beneficiary under an earlier will dated August 18, 1969.

Blanche Fechter, the testatrix, died on February 10, 1976, at the age of eighty-eight years, possessing an estate worth in excess of $275,000.  A long-time resident of the City of Manitowoc, she had been a member of the First Presbyterian Church there since 1952 and active in its Ladies' Society, although not a regular churchgoer.  She was meticulous about her personal appearance and was described by those who knew her as a perfect lady, very well dressed even in her later years.  Up to the time of the execution of the instruments and until she became a resident of the Park Lawn Nursing Home in late 1974—except for two brief periods of hospitalization—she lived alone and managed to care for her own needs in the ordinary manner.

Blanche Fechter's closest relative until his death on November 28, 1972, was her nephew Paul Rahr.  For the first five or six years after his marriage, Paul and his wife Eileen lived in Manitowoc, part of that time in the same building as the decedent, and had daily contact with her.  In 1963 or 1964, Paul Rahr moved his family to

Illinois. From then on Paul saw his aunt every month or every other month, and would stay with her on those occasions for days at a time. In addition, Miss Fechter traveled to Illinois about five times a year to spend holidays and birthdays with Paul and his family.

Some time in the early or mid 1960's, Blanche Fechter gave her nephew Paul Rahr power of attorney over her affairs. The document was drafted by Attorney Paul Duback of Milwaukee, Wisconsin, whose wife was Paul Rahr's first cousin. This same attorney also drafted a will for Blanche Fechter which was executed on August 18, 1969. Attorney Duback had done no other work for the decedent, nor had he ever done any legal work for Paul Rahr. Eileen Rahr testified that her husband had suggested the Milwaukee attorney to his aunt because she had not wanted an attorney in her own town to know her personal business.

The 1969 will gave cash bequests of $5,000 to the First Presbyterian Church and $5,000 to Florence Belgum, a lifelong friend. The testatrix' personal and household goods were given to Paul Rahr. The residue of the estate was to be divided among her closest surviving relatives in the following manner: two-thirds to Paul Rahr (nephew), two-ninths to Pauline Marie Rahr (grandniece), two-twenty-sevenths to Dorothy Ann Ivins (grandniece), and one-twenty-seventh to Virginia Rahr Merritt (grandniece). In the event that Paul Rahr failed to survive his aunt, the personal effects and household furnishings were to be distributed to his widow Eileen Rahr, and his two-thirds share of the residue was to be given to his daughter Pauline Marie Rahr. Attorney Duback testified that when the will was drawn in 1969, Blanche Fechter knew Paul Rahr had a serious health condition and took some pains to decide what would happen should Paul predecease her.

On November 28, 1972, Paul Rahr, the principal beneficiary under the 1969 will, died. On the following

day, Rev. Gervase Zanotti of the First Presbyterian Church visited Blanche Fechter in her home and told her of Paul's death. During the visit he made arrangements with Miss Fechter to take her to Paul's funeral in Illinois. Prior to this visit Rev. Zanotti had never been to Blanche Fechter's house or treated her in any way different from his other parishioners.

Two incidents, dealt with at some length in the trial court, occurred between the funeral and the writing of the second will. Shortly after returning from Illinois, Rev. Zanotti telephoned Eileen Rahr, told her that Blanche Fechter's checkbook was missing and asked if she had taken it. The Reverend testified that Miss Fechter was the one who thought Paul's widow might have taken it. The whereabouts of the checkbook was never resolved.

Also in the beginning of December, 1972, Blanche Fechter received a letter from Paul's widow. The letter, which included four dividend checks from Miss Fechter's investments, contained the following passage:

"I hope to get up to Manitowoc in the next week with Paul Duback from Milwaukee your attorney and will work something out for you."

Leslie Valleskey, the attorney who drafted the 1972 will and later codicils, testified Miss Fechter understood the letter to mean that Mr. Duback was coming to write another will for her. She was very disturbed about that. Valleskey testified that but for the letter she probably would not have come to him so soon or written the second will.

Valleskey's first contact with Blanche Fechter was on December 6, 1972, when she telephoned him about drafting a new will. Valleskey testified Miss Fechter said she was referred to him by Florence Belgum for whom he had previously drafted a will. The decedent came into Valleskey's office for an interview on Decem-

ber 8, 1972. On the basis of information gained during the meeting which lasted about one hour, Valleskey drafted the will which was executed at Valleskey's office on December 12, 1972.

The 1972 will differed substantially from the 1969 will in its provisions. It gave the following cash bequests: $1,000 to the City of Manitowoc, $35,000 to Eileen Rahr (widow of Paul), $25,000 to Virginia Rahr Merritt (grandniece), $25,000 to the children of Dorothy Ann Ivins (deceased grandniece), $5,000 to each of seven friends, $10,000 to another friend, $10,000 to Reverend Zanotti, and $90,000 to Pauline Marie Rahr in trust. The testatrix' personal effects were to be given to the Ladies' Society of the First Presbyterian Church. The residue was to be divided, one-half to go to the First Presbyterian Church and one-half to Memorial Hospital of Manitowoc. In addition, the will appointed Rev. Zanotti personal representative and, jointly with East Wisconsin Trustee Company, trustee of the will.

Two days later, Rev. Zanotti was given a broad power of attorney over Blanche Fechter's personal affairs in a separate document also drafted by Attorney Valleskey. Rev. Zanotti testified he performed the following services for her:

"Such things as taking her to the dentist, taking her to the bank, taking her to her safety deposit box, taking her to the eye doctor, the ear doctor, the grocery store, going shopping. . . Wrote a lot of letters for her, helped her with her hospitalization policies, opened mail, helped her pay bills, take her to the drug store, wrote letters to all the transfer agents for her stocks, took her to the post office, sent out stocks that were called in, helped with repairs around the apartment. That's enough for a start."

Blanche Fechter was hospitalized for a period of one week from January 24 to January 31, 1973 at Memorial Hospital in Manitowoc. The diagnosis recorded by Dr.

Puestow, the attending physician, was "organic brain syndrome due to a generalized arteriosclerosis manifested by mental confusion and poor memory." The medical records further indicated "the patient has been quite confused for some time but has managed to take care of herself at home." Rev. Zanotti testified that he did not call Mrs. Paul Rahr to seek her advice on what should be done with Miss Fechter prior to her hospitalization. In his words, "why should I call her? I had the Power of Attorney."

Some time after leaving the hospital Blanche Fechter again contacted Attorney Valleskey to change her will because she had forgotten to include Mrs. Marie Guttman who was always so nice to her. The testatrix discussed changes which included a cash bequest of $10,000 to her friend, a decrease in Pauline Marie Rahr's bequest from $90,000 to $25,000, and an increase in Rev. Zanotti's bequest from $10,000 to $25,000. Attorney Valleskey testified that he dissuaded the testatrix from making some of the changes. He suggested first that her youngest grandniece Pauline was young enough to need a larger bequest than $25,000. Secondly, he said that rather than increasing the bequest of Rev. Zanotti she should just "pay him as you go along. . . pay him well, whatever he did." The first codicil was executed on May 11, 1973. It modified the 1972 will as follows: Marie Guttman's name was substituted for one of the other friends and the cash bequest for each of the seven friends was increased from $5,000 to $10,000: the bequest to Pauline Marie Rahr was decreased from $90,000 to $75,000.

On the same day the first codicil was signed, Blanche Fechter wrote two letters to Rev. Zanotti. Both letters were written by her in the presence of Zanotti alone. The first letter gave two treasury notes totaling $15,000 to the Reverend "in appreciation and to say thank you for all you have done." Rev. Zanotti admitted that he did

not prepare a gift tax form for Blanche Fechter showing this gift to him. He also testified that he informed no one of the gift at the time. In the second letter Blanche Fechter agreed to pay Rev. Zanotti $5 an hour to reimburse him for his trouble and assistance.

On February 20, 1974, a second codicil was executed by the testatrix. Attorney Valleskey testified that Miss Fechter called him because she did not want the Presbyterian women "pawing over" her personal effects. The second codicil, therefore, changed the bequest of the Ladies' Society to a cash bequest of $1,000, and empowered the personal representative, Rev. Zanotti, to dispose of the testatrix' personal effects in accordance with instructions given to him.

In 1974 the testatrix again required hospitalization, this time for a period which lasted from November 17 to December 16, 1974. The medical reports indicated "the patient has become more and more confused" and "suddenly lost the vision in her left eye." Her condition was diagnosed as an "atherosclerotic embolization to the left central retinal artery from the left carotid," which was considered to be an "irreversible process." The diagnosis also noted "generalized arteriosclerosis with chronic brain syndrome."

On December 16, 1974, Blanche Fechter was released from the hospital and returned to her home with around-the-clock nursing care. According to a letter written to the relatives of Blanche Fechter by Rev. Zanotti, the decedent continued to go "downhill" and was admitted to Park Lawn Convalescent Home on December 23, 1974. The testatrix remained in Park Lawn until February 4, 1976. On that date she was returned to Memorial Hospital where she stayed until her death on February 10, 1976.

The objectors in the trial court and here contend the testatrix lacked testamentary capacity at the time of

the last will and the codicils thereto. In *Estate of O'Loughlin,* 50 Wis.2d 143, 146–47, 183 N.W.2d 133 (1971), we stated:

"The testator must have mental capacity to comprehend the nature, the extent, and the state of affairs of his property. The central idea is that the testator must have a general, meaningful understanding of the nature, state, and the scope of his property but does not need to have in his mind a detailed itemization of every asset; nor does he need to know the exact value of his property. A perfect memory is not an element of a testamentary capacity. 1 Page, *Wills* (Bowe-Parker), p. 617, sec. 12.12. The testator must know and understand his relationship to persons who are or who might naturally or reasonably be expected to become the objects of his bounty from which he must be able to make a rational selection of his beneficiaries. He must understand the scope and general effect of the provisions of his will in relation to his legatees and devisees. Finally, the testator must be able to contemplate these elements together for a sufficient length of time, without prompting, to form a rational judgment in relation to them, the result of which is expressed in the will."[1]

In making the determination of testamentary capacity,

"The general mental condition of one who executes a will is only peripherally relevant, for a person may have a general or usual condition of inability to comprehend and yet have lucid intervals, during which time there is demonstrated testamentary capacity and a will may be appropriately executed." *In Matter of Estate of Becker,* 76 Wis.2d 336, 345, 251 N.W.2d 431 (1977).[2]

[1] *See also, In Matter of Estate of Becker,* 76 Wis.2d 336, 344, 251 N.W.2d 431 (1977); *In re Estate of Evans,* 83 Wis.2d 259, 276, 265 N.W.2d 529 (1978).

[2] *See also, Estate of Dobrecevich,* 14 Wis.2d 82, 109 N.W.2d 477 (1961); *Estate of Kaiman,* 13 Wis.2d 201, 108 N.W.2d 379 (1961).

It is the trial court as finder of fact who makes the determination of testamentary capacity. This finding will not be set aside unless it is contrary to the great weight and clear preponderance of the evidence.

Conflicting evidence was presented concerning Blanche Fechter's mental capacity. Some witnesses testified that her mental condition was normal and that she was capable of managing her affairs. Others found her confused and forgetful. The record is clear on the point, however, that at the time of the execution of all three documents in question Blanche Fechter was living alone and properly caring for herself.

The record also contains evidence of Blanche Fechter's mental condition at the time the instruments were executed. With regard to the will of December 12, 1972, Attorney Valleskey stated that Blanche Fechter knew what property she had and named all the people she wished to include without any difficulty. She seemed to be perfectly normal and knew what she wanted. Speaking of her mental condition at the time of the first codicil, he declared—"I gave her the idea as to what she was worth and she adjusted everything accordingly. She understood what I was talking about and she seemed to be in full agreement." He testified that he was aware that Miss Fechter had been hospitalized in January of 1973. Nevertheless he was confident that when she signed the first codicil in May, 1973, she knew exactly what she wanted to do. Although he felt that the testatrix was unnecessarily concerned about the Presbyterian women at the time of the second codicil, he testified that it was his opinion that Blanche Fechter was of sound mind and memory when she made all three instruments.

Medical testimony was also offered. The decedent's attending physician was unavailable to testify at the

hearing. However the two physicians who offered medical opinions based solely on their education and experience and an examination of the decedent's medical records were in conflict. Dr. Fodden, a pathologist, explained that as a general matter chronic brain syndrome "is a very characteristic brain syndrome manifested by the symptoms of loss of the critical logical thoughtful deductive faculties of the mind. They go first and may be the only things that do disappear, but they do slowly progressively irrevocably. No recovery." Since the medical records indicated that the decedent was suffering from this disease and because this disease must have been developing for some time prior to its diagnosis, it was Dr. Fodden's opinion that the decedent using her own intellect and memory would have been incapable of listing the objects of her bounty or knowing the extent of her property at the time the instruments in question were executed. Dr. Fodden also ruled out the possibility of lucid intervals, explaining that the condition involved in the testatrix' case was not merely senility which comes with aging but an established brain syndrome which involves the degeneration and death of certain cells within the cortical brain structure. Dr. Best, an internist, testified that he would not be able to say with certainty whether Blanche Fechter had sufficient testamentary capacity at the times in question. However, it was his opinion that patients with Miss Fechter's disorder very commonly had a waxing and waning of their cerebral functions, and could have lucid moments. He agreed however that it was unlikely that the decedent could comprehend all her property, make a list of all her property without prompting, and know her relatives in the condition which the medical record indicated she was in in January, 1973 when she was hospitalized. Neither of these doctors had ever seen the decedent as a patient and certainly not at the time of the execution of the documents in question.

The trial court relied on the testimony of Attorney Valleskey who was present at the time the documents were executed, rather than on the pathologist's generalized medical opinion, which was disputed by the internist, regarding what he believed Blanche Fechter's mental capacity was or must have been at the time. The court specifically found that the decedent possessed sufficient testamentary capacity on all three occasions. We conclude these findings are not against the great weight and clear preponderance of the evidence and therefore must be accepted by this court.

The second principal contention by the objectors is that Rev. Zanotti exercised undue influence upon the testatrix.

"Undue influence must be proved by clear, satisfactory and convincing evidence and a finding by the trial court on the issue will not be upset on appeal unless it is against the great weight and clear preponderance of the evidence. [Cases omitted.]

"Therefore, on appeal we examine the record, not for facts to support a finding the trial court did not make or could have made, but for facts to support the finding the trial court did make." *Estate of Hamm*, 67 Wis.2d 279, 282, 227 N.W.2d 34 (1975).

The two long-established methods by which an objector to a will on the grounds of undue influence may challenge its admissibility can be summarized as follows:

"One is by proving the elements that this court has said show undue influence. Those are: (1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result . . . .

"The second method of challenge is to prove the existence of (1) a confidential relationship between the testator and the favored beneficiary and (2) suspicious circumstances surrounding the making of the will. . . ."

*In re Estate of Kamesar,* 81 Wis.2d 151, 158–59, 259 N.W.2d 733 (1977).

Appellants-objectors contend that the evidence does not sustain the trial court's findings under either approach. They further contend that the trial court erred in applying the second test, *i.e.,* the "confidential relationship/suspicious circumstances" test.

A. *Susceptibility to undue influence.*

The testatrix Blanche Fechter was an elderly person. She was at times confused and forgetful. However, this court has stated that the infirmities of old age, such as forgetfulness do not incapacitate one from making a valid will.[3] The pathologist testified that patients with organic brain syndrome are "utterly reliant upon someone else doing their thought process." This conclusion was disputed by the internist who testified that these people may have lucid intervals during which their ability to discriminate and recall facts is regained. The trial court recognized that the decedent exhibited a certain amount of susceptibility to undue influence. He noted particularly that her nephew Paul Rahr, acting as her attorney in fact, had influenced her to sell her home, to make a purchase of land in Florida and to join a golf club there. The court also noted that Rev. Zanotti, when he became her attorney in fact, was able to influence her to give him $15,000 in treasury notes and numerous other monetary gifts to both himself and his wife, including $3,000 for the purchase of an automobile. However, the record also contains evidence, particularly the testimony of Attorney Valleskey, that Blanche Fechter had a mind of her own. The trial court found that there was some support in the record for both points of view, but was unable to find that the evidence of suscep-

---

[3] *Estate of Phillips,* 15 Wis.2d 226, 231, 112 N.W.2d 591 (1961); *In re Estate of Kamesar, supra,* 81 Wis.2d at 159.

tibility to undue influence was clear and convincing. This finding is not against the great weight and clear preponderance of the evidence.

B. *Opportunity.*

The trial court found that Rev. Zanotti had an opportunity to influence Blanche Fechter as to the terms of the two codicils, but that he did not have sufficient time to exercise undue influence upon the testatrix prior to the execution of the will. The court particularly noted that Rev. Zanotti was only slightly acquainted with Blanche Fechter prior to the death of Paul Rahr and that he was not present in the office with Attorney Valleskey at the time of the execution of the will. The evidence does reveal that Rev. Zanotti had never visited Blanche Fechter in her home prior to her nephew's death or in any way distinguished her from his other parishioners. However, according to the testimony of Attorney Valleskey, when he asked the decedent on December 8, 1972 why she wished to leave Rev. Zanotti $10,000 she declared—"he was always nice to me. I belonged to the church since 1952 and he was always friendly to me when I came to the church."

The time from November 29, 1972, the date when Rev. Zanotti first visited the testator in her home, and December 12, 1972, the day on which the will was executed, was relatively short. However, the opportunity to influence is not solely a function of time. In the present case this opportunity also stemmed in large part from the relationship between the two parties, namely the relationship of a long-time parishioner with her minister. The record reveals that this period of time was long enough to enable Rev. Zanotti to receive $100 for driving the testatrix to her nephew's funeral and—two days after the execution of the will—to be given a broad power of attorney over Blanche Fechter's affairs. There is conflicting testimony regarding how many times Rev. Zanotti visited the testatrix during this period. Evelyn

Hendricks, owner of a beauty shop near Miss Fechter's house, said the Reverend's car was there practically every day, sometimes twice a day. Rev. Zanotti denied he saw Miss Fechter nearly every day during this period, but later added, "Well, if it could be proved. I don't have any recollection of that at all."

While the record could support a finding that Rev. Zanotti did have sufficient opportunity to exercise undue influence upon testatrix as to the will of December 12, 1972 under the clear and convincing burden of proof, this court cannot conclude the finding that he did not have such opportunity is against the great weight and clear preponderance of the evidence.

C. *Disposition.*

"A disposition to unduly influence a testatrix means something more than a mere desire to obtain a share of an estate. It implies a willingness to do something wrong or unfair." *Estate of Phillips, supra,* 15 Wis.2d at 232. *See also, Estate of Knutson,* 275 Wis. 380, 82 N.W.2d 196 (1957) ; *Estate of Gaudynski,* 46 Wis.2d 393, 400, 175 N.W.2d 272 (1970) ; *Estate of O'Loughlin, supra,* at 149.

The trial court stated in substance that the evidence demonstrated that Rev. Zanotti was a willing recipient of the numerous, valuable gifts given to himself and his wife by the testatrix, and that he was willing to charge her, perhaps overcharge her, for the services he rendered. However, he found this evidence insufficient to show a disposition to exercise undue influence on Blanche Fechter with regard to her will and the two codicils thereto. The test on this appeal is not whether this court would have reached the same conclusion as the trial court but whether a judicial mind could, on due consideration of the evidence as a whole, reasonably have

reached the same conclusions. Application of this standard dictates that the trial court's finding on the matter of Rev. Zanotti's disposition to influence the testatrix must be affirmed.

D. *Coveted Result.*

The fourth element of undue influence is the requirement that the will provides a coveted result. This element concerns the naturalness of the disposition. The mere fact that a will benefits the alleged influencer does not prove the coveter-result element. Whether a will is unnatural must be determined from a consideration of all the surrounding circumstances. The mere fact that a testator has chosen to leave his property to close friends rather than to relatives does not necessarily render the disposition unnatural.[4]

Attorney Valleskey testified that Blanche Fechter was explicit about the basis for the disposition of her estate. According to his testimony, "she said since Paul died I don't want to give everything to Paul and his family. I want to remember my friends and people who are nice to me." Also, "I want to remember all the people that were nice to me and I also want to take care of Pixie [her grandniece] and her mother [Eileen Rahr] and the twins [her other grandnieces]." She wished to remember Rev. Zanotti because "he was always friendly to me when I came to church," and "when I was in the hospital he came up to visit me daily." Later, she told him—"I think I have given so much to Paul's family that I have got to take care of my friends too." In

[4] *In re Estate of Evans, supra,* 83 Wis.2d at 271; *In re Estate of Kamesar, supra,* 81 Wis.2d at 163; *In Matter of Estate of Becker, supra,* 76 Wis.2d at 348; *Estate of McGonigal,* 46 Wis.2d 205, 217, 174 N.W.2d 256 (1970); *Estate of Steffke,* 48 Wis.2d 45, 49, 179 N.W.2d 846 (1970); *Estate of Von Ruden,* 55 Wis.2d 365, 375–76, 198 N.W.2d 583 (1972).

addition, the objectors were not totally excluded from the will. While the bequest was less than that under the 1969 will, Paul's widow received $35,000 and her daughter Pauline Marie Rahr was given $75,000 in trust. The bequest to Rev. Zanotti was a relatively small portion of the estate. The trial court's finding that the will reflected a reasonable disposition of the testatrix' property and did not achieve a coveted result is not contrary to the great weight and clear preponderance of the evidence.

Undue influence may also be proved by the existence of a confidential relationship between the testator and the one alleged to have exercised undue influence, and suspicious circumstances surrounding the making of the will. When the objector proves the existence of both elements by clear and satisfactory evidence, a rebuttable presumption of undue influence is raised.[5] The burden of going forward with the evidence then shifts to the proponent of the will. If rebutting testimony is introduced the inference still persists, but a trier of the facts is not required to accept the inference and may reject it and accept the rebutting evidence.[6] However, one need not contradict the evidentiary facts giving rise to the inference but may introduce such facts as would permit the rejection of the inference of undue influence.

In the present case, the trial court found neither a confidential relationship nor suspicious circumstances. Consequently, the court did not invoke the inference of undue influence.

This court has given the following description of the confidential relationship that is sufficient to raise a presumption of undue influence:

[5] *In re Estate of Kamesar, supra,* 81 Wis.2d at 164.
[6] *Will of Cooper,* 28 Wis.2d 391, 402, 137 N.W.2d 93 (1965).

"The basis for the undue influence presumption lies in the case in which a confidant can dictate the contents and control or influence the drafting of such a will either as the draftsman or in procuring the drafting. . . If one is not the actual draftsman or the procurer of the drafting, the relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will." *Estate of Steffke*, 48 Wis.2d 45, 51, 179 N.W.2d 846 (1970). *See also, Estate of Velk*, 53 Wis.2d 500, 507, 192 N.W.2d 844 (1972).

In *In the Will of Faulks*, 246 Wis. 319, 360, 17 N.W.2d 423 (1945), this court stated:

"It is considered that the rule established by the very great weight of authority may be stated as follows: The mere existence of a confidential relation between a testator and a beneficiary under his will, such as attorney and client, physician and patient, priest and parishioner, confidential advisor and his advisee, etc., does not of itself constitute undue influence nor cast upon the beneficiary the burden of disproving undue influence. However, the existence of such a relationship may cause a court to scrutinize the evidence more closely and weigh it more carefully. When coupled with other circumstances such as the activity of the beneficiary in procuring the drafting and execution of the will or a sudden and unexplained change in the attitude of the testator or some other somewhat persuasive circumstance, it gives rise to an inference of undue influence which the proponent has the burden of rebutting."

In this case the trial court found there was not sufficient proof to establish that the necessary confidential relationship existed between the testatrix and Rev. Zanotti. There is evidence to show the relationship between Zanotti and Blanche Fechter, until the end of November, 1972, was no different than that between any minister and a member of his congregation. The will was drawn about two weeks later, on December 12, 1972. While

there is some evidence if accepted as a verity that could be sufficient to support a contrary finding, we cannot conclude from the record before us that the finding the court made is against the great weight and clear preponderance of the evidence and as such must be accepted by this court. Because we conclude we are obliged to accept the finding that no confidential relationship was established insofar as the will of December 12, 1972 was concerned, that portion of the order admitting the will to probate must be affirmed.

As to the two codicils the situation is somewhat different.

The trial court's interpretation of the meaning of suspicious circumstances was a restricted one. The court considered that suspicious circumstances are indicated only by a person receiving an inordinate share of the estate, either for himself or for someone who is clearly related to him or one of his favored projects. While this is one factor to be weighed by the trial court, it is neither the sole nor the controlling consideration. The trial court may also consider "the activity of the beneficiary in procuring the drafting and execution of the will or a sudden and unexplained change in the attitude of the testator or some other persuasive circumstance." *Will of Faulks, supra,* 246 Wis. at 360; *Estate of Hamm, supra,* 67 Wis.2d at 294. This court has also considered suspect the haste with which a document was drafted, the testatrix' obviously weakened condition, and the failure of the alleged influencer to inform the testatrix' closest relatives of her hospitalization. *Estate of Komarr,* 46 Wis.2d 230, 241, 175 N.W.2d 473 (1970).

In *Estate of Komarr,* this court reviewed a decision where the trial court, as in the present case, did not find the circumstances surrounding the drafting and execution of the will suspicious and consequently failed to invoke the inference of undue influence. The court, at

242, gave the following outline of the role of the reviewing court on appeal in such a situation:

> "Since the trial court did not invoke the inference of undue influence, its decision did not reach the question of the sufficiency of the proponent's evidence to overcome such inference. This court can therefore consider the sufficiency of such evidence firsthand without applying the standard normally applied on review.

The present case involves several suspicious circumstances. The elderly testatrix, only a month after the execution of the will, was diagnosed as having chronic brain syndrome due to generalized arteriosclerosis manifested by mental confusion and poor memory. Rev. Zanotti, her minister, by his own admission was giving the testatrix far more time than a pastor can give one parishioner. Attorney Valleskey who drafted the instruments had never previously done any legal work for Blanche Fechter, although he had been the attorney in two cases where Rev. Zanotti was either executor, personal representative or beneficiary under the will. Two days after the will was drafted, and during the time when both codicils were executed, Rev. Zanotti had a broad power of attorney over Blanche Fechter's affairs. Furthermore, Attorney Valleskey admitted that he had had conversations with Rev. Zanotti about the documents around the time of their execution, that Zanotti had been present when the two codicils were executed, and that Rev. Zanotti, although not present in the office for the signing of the will, had driven Blanche Fechter to his office for its execution.

The trial court could have found a confidential relationship existed between the testatrix and Rev. Zanotti which, coupled with the suspicious circumstances outlined above, created an inference of undue influence. Nonetheless, as this court has consistently emphasized,

the basic question which must be determined from the evidence submitted is always whether "the free agency of the testator has been destroyed." *Will of Faulks, supra,* 246 Wis. at 359; *Will of Cooper, supra,* 28 Wis.2d at 401. The inferential finding made by the trial court was that her free agency had not been destroyed.

A review of the evidence reveals that while the inference of undue influence could have been accepted by the trial court, there was sufficient evidence to the contrary to justify the court in not accepting it. The court's ultimate determination—on the basis of highly conflicting evidence—that failure to allow the will and its codicils would take away the testatrix' right to execute a will is not against the great weight and clear preponderance of the evidence.

Appellants also contend that the trial court abused its discretion in denying the motion for an order requiring Reverend Zanotti to produce his income tax returns for the four years from 1972 through 1974. The court received extensive testimony relating to the monies Rev. Zanotti had received through his position as attorney in fact for the decedent—all bearing on the issues of disposition and opportunity to influence unduly. The further evidence which the tax returns might have revealed would only have been cumulative. The trial court's denial of the motion was not an abuse of discretion.

*By the Court.*—Order affirmed.